939 So.2d 401 (2006)
Rowena A. LEONARD
v.
RYAN'S FAMILY STEAK HOUSES, INC.
No. 2005 CA 0775.
Court of Appeal of Louisiana, First Circuit.
June 21, 2006.
*403 Jason G. Ourso, Baton Rouge, Counsel for Plaintiff/Appellee Rowena A. Leonard.
Matthew J. Ungarino, David I. Bordelon, Metairie, Counsel for Defendant/Appellant Ryan's Family Steak Houses, Inc.
Before: KUHN, GUIDRY, and PETTIGREW, JJ.
GUIDRY, J.
A local restaurant appeals a trial court's judgment awarding damages to a patron for injuries she sustained when she stepped on a tire stop and fell in the restaurant's parking lot. We amend the percentage of fault assessed by the trial court and, as amended, affirm the judgment.

*404 FACTS AND PROCEDURAL HISTORY
After having dined at Ryan's Family Steak House Restaurant located on Florida Boulevard in Baton Rouge, Louisiana, seventy-five-year-old Rowena A. Leonard exited the restaurant and proceeded to her car, which was parked in the handicapped area of the restaurant's parking lot. When she reached her car, she stepped off the sidewalk onto a blue-painted tire stop protruding from under the front end of her car on the driver's side. Unfortunately, after stepping on the tire stop, the object moved and she fell, sustaining multiple injuries, including: a broken small finger, thumb, and nose; a gash to her forehead, which required stitches; the dislodging of a dental bridge in her mouth; the loss of some teeth; and a cut to her lip, which also required stitches. Ms. Leonard also complained of neck pain and migraine headaches following her fall at the restaurant on February 20, 1999.
In February 2000, Ms. Leonard filed suit against Ryan's Family Steak Houses, Inc. (Ryan's), seeking damages as a result of the fall. At the trial on the merits, the trial court found Ryan's liable to Ms. Leonard and awarded her $20,000 in general damages plus past medical expenses in a judgment signed on December 30, 2004, from which Ryan's appeals.

ASSIGNMENTS OF ERROR
In this appeal, Ryan's challenges the trial court's judgment in the following respects:
A. The trial court erred in finding Ryan's owed a duty of care to this plaintiff to protect her from harm when she intentionally uses a tire stop for a stepping stone, a purpose for which it was not designed or intended.
B. The trial court erred in finding Ryan's was negligent where plaintiff caused or contributed to her own injury by unnecessarily using the tire stop as a stepping stone.
C. The trial court erred in finding that plaintiff proved notice under [La. R.S.] 9:2800.6.

DUTY/UNREASONABLY DANGEROUS DEFECT
The owner or person having custody of immovable property has a duty to keep such property in a reasonably safe condition. It must discover any unreasonably dangerous condition on its premises and either correct the condition or warn potential victims of its existence. Bozeman v. Scott Range Twelve Ltd. Partnership, 03-0903, p. 5 (La.App. 1st Cir.4/2/04), 878 So.2d 615, 619. The basis for such delictual liability is established in La. C.C. arts. 2315, 2316, 2317 and 2317.1. Granda v. State Farm Mutual Insurance Company, 04-1722, p. 5 (La.App. 1st Cir.2/10/06), 935 So.2d 703, 707-08, writ denied, 06-0589 (La.5/5/06), 927 So.2d 326. In particular, La. C.C. art. 2317.1 provides, in pertinent part:
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.
Thus, in order to establish liability based on ownership or custody of a thing, the plaintiff must show that (1) the defendant was the owner or custodian of a thing which caused the damage, (2) the thing had a ruin, vice, or defect that created an *405 unreasonable risk of harm, (3) the ruin, vice, or defect of the thing caused the damage, (4) the defendant knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect, (5) the damage could have been prevented by the exercise of reasonable care, and (6) the defendant failed to exercise such reasonable care. Granda, 04-1722 at p. 6, 935 So.2d 703, 708.
In this appeal, Ryan's admits that it had custody of the parking lot and the tire stop; however, it contends that an unreasonably dangerous condition did not exist for which it owed a duty of care to Ms. Leonard under the facts of this case. The existence or absence of a duty is a question of law. Vinccinelli v. Musso, 01-0557, p. 3 n. 5 (La.App. 1st Cir.2/27/02), 818 So.2d 163, 165 n. 5, writ denied, 02-0961 (La.6/7/02), 818 So.2d 767. Yet, the absence of an unreasonably dangerous condition of the thing implies the absence of a duty on the part of the defendant. Oster v. Department of Transportation and Development, 582 So.2d 1285, 1288 (La.1991). Whether a thing contains an unreasonably dangerous condition is a mixed question of fact and law or policy that is subject to the manifest error standard of review on appeal. Reed v. Wal-Mart Stores, Inc., 97-1174, pp. 3-4 (La.3/4/98), 708 So.2d 362, 364.
To reverse the factual findings of the trier of fact, an appellate court must find (1) a reasonable factual basis does not exist in the record for the finding and (2) the record establishes that the finding is clearly wrong or manifestly erroneous. The issue to be resolved by a reviewing court is not whether the fact finder's conclusion is right or wrong, but whether the conclusion is a reasonable one. Stobart v. State through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). It is generally improper to characterize a risk as unreasonable without considering the surrounding circumstances. Vinccinelli, 01-0557 at p. 5, 818 So.2d at 166.
Whether a condition is unreasonably dangerous requires consideration of: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, which includes the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature. Bozeman, 03-0903 at p. 6, 878 So.2d at 619.
The degree to which a potential victim may observe a danger is also a factor in the determination of whether the condition is unreasonably dangerous. Williams v. Leonard Chabert Medical Center, 98-1029, p. 8 (La.App. 1st Cir.9/26/99), 744 So.2d 206, 211, writ denied, 00-0011 (La.2/18/00), 754 So.2d 974. The owner or the person who has custody of the property may have no duty to protect against an open and obvious hazard. If the facts of a particular case show that the complained-of condition should be obvious to all, the condition may not be unreasonably dangerous and the defendant may owe no duty to the plaintiff. Pitre v. Louisiana Tech University, 95-1466, 95-1487, p. 11 (La.5/10/96), 673 So.2d 585, 591, cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996).
The trial court, in this matter, specifically found that "the parking lot stop was uneven and did, in fact, cause the pedestrian, or the plaintiff in this matter to fall." Moreover, implicit in the trial court's ultimate determination of liability is the conclusion that the tire stop presented an unreasonably dangerous condition. Having reviewed the evidence in the record before us, we cannot say that the trial *406 court was manifestly erroneous in concluding that the tire stop presented an unreasonably dangerous condition.
According to Russell Gardner, plaintiff's expert in the field of civil engineering addressing safety issues, industry guidelines require the anchoring of tire stops. He testified that the minimum standard for a tire stop is eight inches wide, six inches tall, and approximately six feet in length. Tire stops should be set two and one-half feet from the curb and centered in the parking lane. Mr. Gardner opined that to properly anchor tire stops, qualified and trained personnel should use three-fourths-inch-diameter iron pipe or rebar embedded at least eighteen inches below the parking lot surface.
Ryan's expert in the field of civil engineering with an emphasis on structural safety, Allison J.P. Launey, testified that the purpose of a tire stop is to ensure that cars do not intrude into a passageway, which in this case was the sidewalk adjacent to the handicapped area of the parking lot. Mr. Launey stated the tire stop acted as a guide to parking motorists. In noting the purpose, the civil engineer did not distinguish between anchored and unanchored tire stops. He stated that under the Americans with Disabilities Act (ADA),[1] which is applicable to the handicapped area of Ryan's parking lot, tire stops were required to be anchored and located in the center of the parking slot.
Michael J. Baumann, an insurance claims adjuster for the City of Baton Rouge/Parish of East Baton Rouge, testified that he was processing a neighbor's claim on March 9, 1999, when he learned about Ms. Leonard's fall. He went by her house and, after talking to her, drove to the parking lot of the Florida Boulevard Ryan's where he took pictures of the handicapped area. Mr. Baumann stated that on March 9th, he encountered Daryl Trammell, a manager at the restaurant, who advised him that the handicapped area of the parking lot was in the same condition it had been in when Ms. Leonard fell on February 20th. Mr. Baumann's photographs of the parking lot were admitted into evidence.
The pictures show the handicapped area clearly designated with blue paint. A five-foot, diagonally blue-striped area for handicap access adjoins each of the four parking lanes in the pictures. The fourth parking slot of the handicapped area appears the furthest from the front door of the restaurant. A blue-painted tire stop misaligned, broken and exposing deteriorated concrete and a metal rod also appear in the fourth parking slot in the pictures. Concrete debris was visibly evident adjacent to the tire stop, and concrete chips were present between the sidewalk and the tire stop. In the third parking slot appears a blue-painted tire stop, visibly smaller than the tire stops in the other parking slots of the handicapped area.
Ms. Leonard testified by deposition. She stated that after she left the restaurant, she proceeded to her car. She insisted that she had parked her 1981 Chevrolet Monte Carlo in the third parking slot from the front door. Ms. Leonard recalled that all the handicapped parking slots, i.e., two on the side closest to the restaurant's front door and one on the other side of her car, had vehicles parked in them. After she exited the restaurant, she thought that her car was tilting to one side. Ms. Leonard walked on the sidewalk adjacent to the parking lot in front the driver's side of her car and, looked at the passenger's side front tire to determine whether it was flat. Content that it was not, Ms. Leonard said *407 that she turned and proceeded back along the sidewalk in front of her car toward the driver's side door in a direction back toward the entrance of the restaurant.
As she reached that point on the sidewalk parallel to the driver's door, Ms. Leonard attempted to step down from the curb toward her car. There, she encountered the blue-painted, concrete tire stop protruding from under the front of the driver's side of her car. She was unsure whether it was the entire tire stop or a portion of it, but she was certain it was the tire stop for the parking slot into which she had parked her car and not for some other parking slot. Ms. Leonard stated that the tire stop was jammed toward the sidewalk so close that she could not place her foot between the sidewalk curb and the blue-painted tire stop to step onto the ground. Therefore, Ms. Leonard stepped onto the tire stop to proceed toward her car. According to Ms. Leonard, when she stepped onto the concrete tire stop, it moved and she fell face first to the ground.
Daryl Trammell, the manager on duty at Ryan's on the date of the accident, was no longer employed by Ryan's at the time he was deposed. His deposition testimony was introduced into evidence at trial. He remembered that he was inside the restaurant when he learned that Ms. Leonard fell. He went to the parking lot and found Ms. Leonard standing on the sidewalk in front of her car, visibly injured and bleeding. Mr. Trammell remained with Ms. Leonard until an ambulance arrived to take her to the hospital and attempted to attend to her immediate medical needs.
Mr. Trammell stated that Ms. Leonard's full-sized car was parked in the parking slot located furthest away from the Ryan's front door.[2] He recalled that the car covered most of the tire stop and, therefore, he could not ascertain the condition of the tire stop. He did not see any gravel, rocks, or debris around Ms. Leonard's car, but he acknowledged that he did not conduct an inspection of the area. Mr. Trammell thought that a small portion of the tire stop might have protruded from the driver's side of Ms. Leonard's car. He said that no corrective action was taken to the tire stop after Ms. Leonard's fall because Ryan's did not see any breaks in the tire stop at that time. He was unaware of any prior problems or accidents involving tire stops in the Florida Boulevard Ryan's parking lot.
According to the testimony of Anthony Jerrell Bacon, an employee who performed utility and dishwashing duties for Ryan's, he was required to clean up the parking lot daily. Mr. Bacon arrived at the restaurant at 9 a.m., before there were any cars in the parking lot and picked up paper and bottles and swept up the rocks that regularly accumulated around the tire stops. He stated that when a tire stop was "busted up real bad," he reported it to a supervisor. He recalled that he and another employee had moved broken tire stops once or twice, taking them to the back of the restaurant. After a tire stop was removed, it was subsequently replaced, but Mr. Bacon did not know who replaced it or from where the replacement tire stops were obtained. Mr. Bacon said that during his morning parking lot cleanup, when he encountered a tire stop out of position *408 in a parking slot, he would push it back into place, noting that proper alignment was designated by painted lines. When he properly positioned a tire stop, he did not secure it in any manner and indicated that it would likely move again when a vehicle hit it.
General manager, Robert Stack, testified that he worked the early shift on February 20, 1999, and that he had completed Ryan's 10:30 a.m. checklist, which indicated that the parking lot was "satisfactory." To Mr. Stack, this meant that the parking lot was clean and free from debris. Mr. Stack explained his standard procedure on workdays was to drive through the parking lot upon arrival in the morning, looking for trash and for security concerns. When completing the daily checklist that was to be done at 10:30 a.m. and 3:30 p.m., Mr. Stack walked to the front of the store where he visibly inspected the parking lot. He acknowledged that he did not conduct up-close inspections of any of the tire stops, including those in the handicapped area, and that his view of the handicapped area was limited when all four of the parking slots had vehicles in them. Mr. Stack did not know who completed the 3:30 p.m. checklist on February 20, 1999, which indicated that the parking lot was "satisfactory" and was the one closest in time to Ms. Leonard's fall.
Mr. Stack conceded that Ryan's did not have any specific safety inspection or maintenance policies or programs related to the tire stops. He said that his replacement policy at the Florida Boulevard Ryan's was to take tire stops from that portion of the parking lot behind the restaurant where no cars parked and, using a dolly, move them to the front. He stated that he would set the replacement tire stop on the spikes that remained in the ground after the broken one had been moved. He indicated that he would select a replacement tire stop with holes that would align with the spikes that were already in the ground.
Ms. Leonard's explanation of her fall, the March 9, 1999 photographs taken by Mr. Baumann that Mr. Trammell verbally acknowledged were accurate depictions of the accident site, and Mr. Bacon's testimony indicating that he would physically adjust the tire stops when they were out of place, all support a finding that the tire stop at issue was unanchored. Obviously, a tire stop's purpose of providing a buffer zone to a passageway may nevertheless be served when a tire stop is unanchored. Depending on its exact placement, an unanchored tire stop may be able to provide as much as its width  a minimum of eight inches  as additional distance between the passageway and a vehicle's front wheels. But clearly an unanchored tire stop cannot act as a guide to a parking motorist when improperly positioned. And simply the force of a parking vehicle may readily reposition it. Thus, the utility of an unanchored tire stop is minimal when compared with one that is anchored.
Conversely, the likelihood and magnitude of harm created by an unanchored is potentially great. A person who does not observe an out-of-place tire stop can readily fall. Although the more foreseeable risk posed by an unanchored tire stop is that of an unobserved and unexpected tripping hazard, the risk posed by the tire stop in this instance was no less actionable because the plaintiff observed the unanchored, misaligned tire stop. Cf. Barnhill v. Louisiana Power & Light Company, 28,903, p. 4 (La.App. 2nd Cir.2/26/97), 690 So.2d 890, 893 (wherein the court held "[t]he fact that the parking block itself was visible does not necessarily mean that the risk of hazard was so apparent as to be easily observed.")
*409 In this case, we have an elderly lady, who having already approached her car to observe whether the passenger-side tire was flat, reasonably sought to access her vehicle by the nearest path. Finding her path obstructed, albeit not completely, by the protruding tire stop, she chose to step on tire stop as opposed to stepping over it. As Ms. Leonard explained, the reason she did not simply step over the tire stop was because she was up on the sidewalk, "and if I would have jumped  well, my legs wasn't that long, I couldn't reach from here all the way over here. I tried that, but it wouldn't work." Moreover, it would not have been apparent, even to the most reasonably prudent person, that the concrete tire stop of considerable weight  an estimated 135 pounds  would move upon being stepped on by the plaintiff.
Nevertheless, as plaintiff's expert opined, the force with which the 165-pound Ms. Leonard stepped on the smaller-sized, unanchored tire stop in the third slot would be sufficient to cause it to move, if she fell in the third parking slot. If the fall occurred in the fourth parking slot, both parties' civil engineering experts agreed that Ms. Leonard could have caused it to move by stepping on the broken, unanchored tire stop.
As a pedestrian who encounters an unanchored tire stop may, with sufficient force, cause it to move, increasing the likelihood of a loss of balance, an unanchored tire stop heightens the potential of a fall by an ordinary pedestrian traversing a parking lot to return to his or her car, and particularly to patrons eager to enter a restaurant to eat or who are in a more relaxed state after having consumed a meal. Based on these considerations, we believe a restaurant owes a duty to an inattentive pedestrian as well as an attentive one and, therefore, find that the unanchored tire stop in Ryan's parking lot on February 20, 1999, was not an open and obvious hazard but rather that it presented an unreasonable risk of harm to patrons of the restaurant. Hence, we find no error in the trial court's conclusion that Ryan's had a duty to discover the risk posed by the unanchored tire stop and to anchor or otherwise correct it.

NOTICE/KNOWLEDGE
In its only challenge to the trial court's implicit determination that the restaurant had knowledge of the defect, Ryan's asserts that it is not liable to Ms. Leonard because she failed to prove the notice required under La. R.S. 9:2800.6 B(2),[3] which sets forth a plaintiff's burden of proof against a merchant. Assuming that La. R.S. 9:2800.6 is applicable under the facts of this case, because we have found no manifest error in the trial court's factual finding that the tire stop upon which Ms. Leonard fell was unanchored, a reasonable factual basis exists to support a finding that Ryan's created the defect and, therefore, notice was not required under La. R.S. 9:2800.6 B(2).
Mr. Stack testified that he replaced broken tire stops with those in the portion of the parking lot located behind the restaurant where cars did not park. The photographs taken by Mr. Baumann showed that the tire stops in both the third and *410 fourth parking slots of the handicapped area were replacements because the one in the third slot was obviously smaller than the others in the handicapped area and the one in the fourth slot was visibly out of position. And the photographs clearly showed in the fourth parking slot an absence of any spikes upon which a tire stop could have been placed. Thus, a fair inference of the evidence supports a finding that Ryan's created the condition as required to find a merchant liable under La. R.S. 9:2800.6 B(2). Moreover, based on Mr. Baumann's photographs, the testimonial evidence  particularly that of Mr. Bacon and Mr. Stack  and the reasonable inferences of fact, the trial court's implicit finding that Ryan's had knowledge of the defect is not manifestly erroneous. And the trial court correctly determined that Ryan's is liable under La. C.C. arts. 2315, 2317 and 2317.1, a conclusion the restaurant has not challenged in this appeal.

COMPARATIVE FAULT
Like all factual findings, the standard of review of comparative fault allocations is that of manifest error. Laborde v. St. James Place Apartments, 05-0007, p. 5 (La.App. 1st Cir.2/15/06), 928 So.2d 643, 647. In determining fault, the trier of fact should consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. In the assessment of the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967, 974 (La.1985).
In making its assessment of fault, the trial court stated that it "finds no duty of the plaintiff not to step on the [tire] stop in question, and therefore, finds no comparative fault on the part of the plaintiff." Based on the record before us, we find this determination by the trial court to be manifestly erroneous. Ms. Leonard was 75 years old at the time she was injured in Ryan's parking lot. As a result of her age and diminished abilities, she was issued a handicapped-parking decal, which allowed her to park in the handicapped parking area at the restaurant. Further, at the time of the accident, Ms. Leonard suffered from Parkinson's disease, which condition she was diagnosed with in 1994.
According to Ms. Leonard's testimony, she turned on the sidewalk and proceeded toward the driver's side of her car, after having determined that she did not have a flat tire. She went to step down and:
when I went to step down, it was one of these blue markers here, but it had been moved or something and it was closer to the sidewalk. And it . . . was a piece sticking out further on the driver's side. So what I did, I tried to put my foot in between the blue and the sidewalk. And the space was too small, so I took my foot and I put it on top of the tire stop and thought I would get down that way to get to my driver's side. And when I did that, the thing moved, and I went forward on my face.
Several times, Ms. Leonard stated that the tire stop was close to the sidewalk, indicating that it was not in the place she ordinarily would have expected it to be. It is clear from her testimony that Ms. Leonard saw the tire stop and was aware that it was out of place. Nothing in the record *411 establishes a reason why, upon seeing the out-of-place tire stop, Ms. Leonard did not continue a few steps down the side walk and utilize the five-foot, diagonally painted, blue-striped handicap access area to the left of the both the third and fourth handicapped parking slots. Instead, a woman of her age and diminished abilities chose to precariously balance her 165-pound frame on the narrow tire stop, which, even in absence of the movement or shifting of the tire stop, more than likely contributed to her lack of balance.
Ms. Leonard's testimony that she was going to church services a short distance away, which did not start for an hour and a half, demonstrates that she was not in any particular hurry. Although clearly foreseeable, there were no exigent circumstances hastening or justifying Ms. Leonard's decision to take the shortest route to the driver's side door of her car in view of the obstruction presented by displaced tire stop. While it is clear that Ryan's created the risk of harm by placing an unanchored tire stop in the handicapped area of its parking lot, Ms. Leonard was in a position to avoid the accident simply by walking around the out-of-place, unanchored tire stop that she clearly saw before she stepped on it. Under these circumstances, we assess 10 percent of the fault to Ms. Leonard and 90 percent to Ryan's and amend the trial court's judgment accordingly.

CONCLUSION
For these reasons, the trial court's judgment is amended to assess Ms. Leonard with 10 percent of the fault, and to correspondingly reduce the percentage of fault attributable to Ryan's. In all other respects, the judgment is affirmed. Appeal costs are apportioned ten percent to Rowena A. Leonard, and ninety percent to Ryan's Family Steak Houses, Inc.
AMENDED AND, AS AMENDED, AFFIRMED.
KUHN, J., dissents and assigns reasons.
KUHN, J., dissenting.
I disagree with the majority's conclusion that Ryan's Family Steak House, Inc. (Ryan's) had a duty to anchor or otherwise correct the unanchored tire stop located in the handicapped section of its restaurant parking lot so as to ensure that plaintiff, Rowena Leonard, could utilize the tire stop to step on as she proceeded to her car.
In general, the owner or the person who has custody of the property may have no duty to protect against an open and obvious hazard. If the facts of a particular case show that the complained-of condition should be obvious to all, the condition may not be unreasonably dangerous and the defendant may owe no duty to the plaintiff. Pitre v. Louisiana Tech Univ., 95-1466, 95-1487, p. 11 (La.5/10/96), 673 So.2d 585, 591, cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996). The degree to which a potential victim may observe a danger is one factor in the determination of whether the condition is unreasonably dangerous. A landowner is not liable for an injury that results from a condition that should have been observed by the individual in the exercise of reasonable care or was as obvious to a visitor as it was to the landowner. Williams v. Leonard Chabert Medical Ctr., 98-1029, p. 8 (La.App. 1st Cir.9/26/99), 744 So.2d 206, 211, writ denied, XXXX-XXXX (La.2/18/00), 754 So.2d 974.
In this case, Rowena Leonard testified that she saw that the blue-painted tire stop was jammed so close to the sidewalk that she could not place her foot between the curb and tire stop. Thus, her testimony establishes that she saw the tire stop was unanchored and, despite her observation *412 and her knowledge of her handicapped condition, nevertheless stepped on it. Clearly, the unanchored tire stop was an open and obvious hazard as readily observed by Ms. Leonard as it was by Ryan's.
As the majority correctly notes, an unanchored tire stop is not devoid of all utility. Even unanchored, a tire stop's purpose of providing a buffer zone to a passageway is fulfilled. In this case, the passageway for which the tire stop provided protection was the sidewalk in front of the restaurant that was used by handicapped customers. Thus, even unanchored, the Ryan's tire stop served a laudable purpose. The real issue in this case is whether any duty Ryan's may have to anchor a tire stop extends to the use to which Ms. Leonard put it, i.e., utilizing the tire stop as a step. Obviously, the cost of imposing such a duty exceeds any limited benefit that those who may choose to use the tire stop to walk on may derive. Simply stated, the tire stop is not designed to be utilized as a step. When a tire stop is lodged up against the sidewalk curb, it is evident that it is unanchored and unsecured, and a restaurant patron  even one who is handicapped  cannot proceed to use the tire stop to step on without regard to the possibility that it may move. Even more so where, as here, it is undisputed that available for Ms. Leonard's use was a five-foot handicapped area adjacent to the parking spot from which she could have been easily accessed her car. Any duty Ryan's may owe to the public to anchor a tire stop does not extend to this plaintiff who clearly observed the open and obvious condition and proceeded to use the unanchored tire stop in a manner for which it was not designed. And the trial court erred as a matter of law in concluding that it did.
Moreover, assuming arguendo that such a duty existed, in comparing fault, undoubtedly Ms. Leonard bore the greatest percentage. A pedestrian has a duty to see that which should be seen and is bound to observe her course to see if her pathway is clear. Carr v. City of Covington, 477 So.2d 1202, 1204 (La.App. 1st Cir.1985), writ denied, 481 So.2d 631 (La.1986). Because the trial court found there was "no duty of the plaintiff not to step on the [tire] stop," it concluded there was no comparative fault on Ms. Leonard's part.
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Evans v. Lungrin, 97-0541, p. 6 (La.2/6/98), 708 So.2d 731, 735. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541 at pp. 6-7, 708 So.2d at 735.
The trial court's failure to compare Ms. Leonard's duty to see that which should be seen and to observe her course to see if her pathway was clear with Ryan's duty to anchor the tire stop was legal error. On a de novo assessment of the comparative fault, I would find that no less than 75% of the fault is attributable to Ms. Leonard. For these reasons, I dissent.
NOTES
[1] See generally 42 U.S.C. §§ 12201-12213.
[2] In his deposition, Mr. Trammell testified that Ms. Leonard had parked in the fourth parking slot. In a recorded statement he had given to the insurance company on June 25, 1999, Mr. Trammell indicated that Ms. Leonard had parked in the third parking slot. But in that interview, he recalled only three parking slots in the handicapped area. Thus, in both his deposition and the recorded statement, Mr. Trammell consistently testified that Ms. Leonard had parked in the parking slot located furthest from Ryan's front door.
[3] Louisiana Revised Statute 9:2800.6 B(2) provides in pertinent part:

In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, . . . [t]he merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.