# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 19-338

JOY RICHARD

VERSUS

CALCASIEU CAMERON HOSPITAL
SERVICE D/B/A WEST CALCASIEU
CAMERON HOSPITAL, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2015-1395
HONORABLE RONALD F. WARE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## PHYLLIS M. KEATY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and D. Kent Savoie, Judges.

**AFFIRMED AS AMENDED.**

Jack W. Caskey
704 Ryan Street
Lake Charles, Louisiana 70601
(337) 439-8854
Counsel for Plaintiff/Appellee:
    Joy Richard

Robert W. Robison, Jr.
Shelby L. Giddings
Watson, Blanche, Wilson & Posner
Post Office Drawer 2995
Baton Rouge, Louisiana 70821-2995
(225) 387-5511
Counsel for Defendant/Appellant:
    West Calcasieu Cameron Hospital

**KEATY, Judge.**

Joy Richard was injured in a trip and fall in the parking lot of Calcasieu Cameron Hospital Service District d/b/a West Calcasieu Cameron Hospital (WCCH). After a trial on the merits, judgment was rendered in favor of Richard and against WCCH, awarding her general and special damages. WCCH appeals, and for the following reasons, we amend the judgment and affirm as amended.

## FACTS AND PROCEDURAL HISTORY

Richard tripped and fell in the parking lot of WCCH on the evening of July 7, 2014. Her adult daughter, Diana Piper, was an employee of the hospital, and Richard had gone there to pick her up after her shift ended. Richard filed this suit against WCCH to recover for the damages she allegedly sustained in the accident. The matter proceeded to a one-day bench trial, following which the trial court issued an oral ruling, finding that WCCH was negligent and 100% at fault for Richard's damages. Written judgment was signed on January 7, 2019, awarding Richard $50,000.00 in general damages, $6,750.07 in medical special damages, and $1,500.00 in expert witness fees.

On appeal, WCCH asserts that the trial court erred in finding that Richard met her burden of proof under La.Civ.Code art. 2317.1; in awarding excessive damages to Richard; in not assessing fault to Richard; and in awarding Richard special damages over and above her general damages award as the parties stipulated to a bench trial on the basis that her claims would not exceed $50,000.00.

## DISCUSSION

Richard's premise liability claims against WCCH are governed by La.Civ.Code art. 2317.1,[1] which provides:

---

[1] This court has held that hospitals do not come under the ambit of La.R.S. 9:2800.6, which governs the liability of merchants. *See Harkins v. Natchitoches Par. Hosp.*, 97-83 (La.App. 3 Cir. 5/7/97), 696 So.2d 19.

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

To prevail under La.Civ.Code art. 2317.1, Richard had the burden of proving that:

(1) that the thing which caused the damage was in the defendant's custody or control, (2) that it had a vice or defect that presented an unreasonable risk of harm, (3) that the defendant knew or should have known of the vice or defect, (4) that the damage could have been prevented by the exercise of reasonable care, and (5) that the defendant failed to exercise such reasonable care.

*Owens v. McIlhenny Co.*, 18-754, p. 3 (La.App. 3 Cir. 3/27/19), 269 So.3d 839, 842 (quoting *Riggs v. Opelousas Gen. Hosp. Trust Auth.*, 08-591, p. 4 (La.App. 3 Cir. 11/5/08), 997 So.2d 814, 817).

Six witnesses testified at trial. Richard stated that she was seventy-five years old at the time of trial. Richard explained that Piper worked the 2:30 p.m. to 11:00 p.m. shift at WCCH, and Richard routinely drove her to and from work. On the night of the accident, Richard had arrived early in order to visit her granddaughter who was a patient at Cornerstone, an acute-care facility within WCCH. Richard parked in a handicap spot near the entrance to Cornerstone. She had some items for her granddaughter which she took out of the back of her car before walking up a handicap ramp and entering the facility. After Piper's shift ended, she met Richard in her daughter's room, and they left the facility through the same door that Richard had entered. Richard explained that it was "pitch dark," and as she stepped down into the parking lot in front of her car, her foot hit a concrete bar, she fell flat on her face, and her "head bounced on the concrete." She explained that "[t]here was a light further off in the distance, but it did not light up that area" of the parking lot.

On cross-examination, Richard stated that she had been to the same parking lot and had entered through the same door at WCCH when visiting her

granddaughter before the night of the accident. She confirmed that when the hospital door opened the night of the accident, "there was enough light for [her] to see[, b]ut when [she] came out, the door was closed; and it was completely dark again." Richard acknowledged that she did not walk down the handicap ramp when she and her daughter left the facility. Richard stated that because her daughter was walking down the ramp to get to the passenger side of the car, she "just naturally walked to the driver's side." When shown photographs that depicted the parking lot and building where she fell at nighttime, Richard emphatically stated that on the evening of her accident, there was no light on the corner of the building to the left of the entrance, nor under the canopy covering the doorway where she entered and exited the building.

Richard testified that after she fell, she screamed for her daughter to help her. Piper ran back into the hospital to get assistance, and four people came out with a wheelchair. They rolled Richard over onto a sheet, lifted her up into the wheelchair, and rolled her to the Emergency Room (ER). After X-rays and a CAT scan were taken, an ER employee gently cleaned her face, which was bleeding and "all skinned up." When a physician later came into her room and spoke to her about ordering some diagnostic tests, Richard told him, "That's already been done." That doctor wrote her prescriptions for antibiotics and pain pills and said he would return after finding out the results of the X-rays and CAT scan. He never returned to Richard's room, however, and she was sent home that evening, never to learn the results of the tests run in the ER of WCCH.

Richard said that the accident damaged the right side of her nose, explaining that "[t]he cartilage was shoved over to where it's almost completely closed." As a result, she "would literally panic because [she] wasn't getting enough air." Richard stated that she had experienced trouble with her lungs and with breathing before the

accident, but now she requires oxygen around the clock. With regard to her lungs, Richard stated that she probably had issues with her lungs before she was aware of them. She said that a Dr. Luke Williams had recently told her that "about 43 percent of [her] lungs . . . work." Richard went to Dr. Brad LeBert, a board-certified otorhinolaryngologist,[2] approximately one month after the accident regarding problems with her hearing.[3] She told him about her difficulty breathing since the accident, and he attempted to perform a surgery to "scrape that cartilage that's blocking this right side," but when they tried to put her to sleep for the procedure, her oxygen levels dropped dangerously low, and they could not proceed.

Richard described her pain level after her fall as excruciating. On a scale of one to ten, she ranked it a twelve. Richard identified two pictures of herself that were accepted into evidence. The first was taken by her daughter with her cellular telephone on the night of the accident, and the second was her driver's license photograph taken some time later. Richard said she had facial bruising for several months after the accident. She stated that she had fallen several times before the subject accident but had never hit her face or nose in any of them. She also described an incident that happened six months to one year after the subject accident in which she passed out when driving and woke up in the WCCH Intensive Care Unit (ICU). According to Richard, she did not injure her face or nose in that accident.

Piper testified that she was living with her mother at the time of the accident. She did not have a car, so her mother drove her to and from her job as a housekeeper at WCCH. Her mother usually dropped her off at the employee entrance that was separate from, but in the same parking lot as, where this accident occurred. On the day of the accident, Richard told Piper that she would be visiting her granddaughter

---

[2] In layman's terms, Dr. LeBert is an ear, nose, and throat surgeon.

[3] Richard stated that her hearing problems were unrelated to the subject accident.

4

at Cornerstone before picking Piper up that evening. Therefore, Piper went to her daughter's room at the end of her shift. About ten minutes later, Piper and Richard left to go home. Piper knew where Richard's car was parked because she always parked in that same handicap spot if she was coming inside rather than waiting in the car for Piper to come out. Piper testified that she opened the door to exit the building, and then she walked down the handicap ramp toward the passenger side, and her mother walked on the sidewalk toward the driver's side, of the car. As Piper was opening the rear passenger door to put her bags into the car, she heard her mother scream that she had fallen. She then ran around the back of the car and saw her mother laying face down in the parking lot. No lights were on in the area where Richard's car was parked. Piper was shown photographs of the parking lot where the accident took place, and she confirmed that the light fixture shown was not working. According to Piper, there was a bench outside the exit she and Richard used to leave the building where she and several other hospital employees would smoke cigarettes because the light there "hardly ever worked." Piper did not report the light being out to anyone on the night of the accident.

Piper explained that her mother was mobile and "could drive and get around by herself quite well" before the accident. Richard had experienced issues with her lungs, but not with her nose, and she had never needed oxygen. Piper estimated that her mother began needing oxygen within a year of the accident and has not been without it since then. Piper is currently Richard's full-time caretaker because of her declining health.

Dr. Brad LeBert was recognized as an expert in the field of otorhinolaryngology. He testified that he first saw Richard on August 6, 2014, regarding her complaints of a "swooshing" sound in her right ear. Dr. LeBert stated that "upon examination of her head and neck, we also noticed that her septum or the

5

midline portion of her nose was deviated; and we began discussing her problems with obstructive breathing." He testified that he diagnosed Richard with deviated nasal septum and that his notes indicated it occurred after she fell one month prior. He suggested that she consider septoplasty, surgical correction of her deviated septum, after getting her hearing problem resolved, which suggestion he reiterated when he saw her on August 20, 2014, and November 6, 2014. According to his notes from her November 2014 visit, they again discussed Richard having a septoplasty to correct her nasal breathing, which he noted had begun after her July 2014 fall, along with a:

> submucosal resection of her turbinates, which basically means straightening the crooked portion of the nose and reducing some nasal swelling in her nose; but I felt that we needed to obtain surgical clearance from Dr. Kent Thomas, who was her primary medical doctor. Because of her other comorbid medical conditions, I wanted to be sure that she was a safe patient to be put to sleep in the operating room.

Dr. LeBert ordered a sleep study for Richard, which took place on December 5, 2014. Richard was diagnosed with sleep apnea but she "was unable to tolerate her continuous positive airway pressure machine because she felt like she could not get enough air through the right nostril, which is the side that the septum was deviated to." Dr. LeBert saw Richard twice in April 2015. By then, Dr. Thomas had cleared her for a nasal surgery. However, after discussing "Richard's overall medical health" with her and Dr. Luke Williams, a pulmonologist, they "did not feel like an elective surgery to repair a deviated septum was worth the risk to her life because of her restrictive lung disease and cardiac issues." Dr. LeBert explained that Richard never embellished or exaggerated her condition. She simply said that she "fell and hit her face," and his clinical findings were consistent with the injury as she explained it to him. Finally, he stated that Richard was scheduled to have follow-up appointments with him.

After Richard rested her case, WCCH moved for an involuntary dismissal on the grounds that Richard failed to meet her burden of proving that the hospital knew or should have known of an unreasonably dangerous condition that caused Richard's injuries. The trial court denied the motion. Defendant then called three witnesses in its case on rebuttal.

Shelly Conner testified that she was employed at WCCH as an RN house supervisor for the night shift at the time of Richard's accident. Her duties included receiving patient concerns or complaints. Conner wrote a report documenting Richard's accident after seeing Piper in the ER and recognizing her as a WCCH employee. In the report, Conner stated that Richard "tripped on [a] yellow cement rectangle block at the parking spot." The report noted that Richard received treatment at WCCH and that CT scans of her head and face revealed a nasal fracture. According to Conner, neither Piper nor Richard mentioned anything about lighting issues. She explained that had they done so, she would have noted it in her report and that she would have reported it to the maintenance department. She also stated that if she were to notice a light out outside of a hospital entrance, she would have notified maintenance. Finally, she stated that during her ten-plus years at WCCH she was unaware of anyone falling in the parking lot due to lighting issues or to tripping over a parking "bumper." On cross-examination, Conner confirmed that she did not inspect the area where Richard fell.

David Cedars testified that he was the supervisor of plant operations at WCCH when Richard's accident occurred. His duties at that time included maintaining the lighting in the Cornerstone parking area. When shown several pictures of where the accident occurred, Cedars noted that his office was on the other side of the parking lot, so he was familiar with the door where Richard entered and exited when she

7

went to Cornerstone. He said that there were two lights for that door, and another at the corner of the building, all of which come on automatically at night.

Cedars explained that the maintenance department did not have a policy to monitor the lights, but it would receive a work order if someone reported that a light needed to be fixed. He reviewed the work orders for June and July of 2014 and found none concerning any lights where Richard's accident occurred on July 7, 2014. Cedars denied having knowledge of anyone other than Richard falling outside of the Cornerstone entrance or of any dangerous condition existing at that location. On cross-examination, he confirmed that he had no personal knowledge of whether the lights at the Cornerstone exit were working or not working when Richard fell.

Kristine Lyons testified that she became the Chief Quality Transformation officer at WCCH in September 2016. She is "in charge of quality, regulatory, safety, patient safety, and risk management." Lyons stated that she was familiar with the Cornerstone entrance and area where Richard fell. She reviewed the records of accidents occurring at WCCH and could find no record of anyone else ever falling or of any problems with the lighting at that location.

Following the close of evidence, the parties' attorneys presented closing arguments. Afterward, the trial court then announced that it was ruling in favor of Plaintiff before issuing oral reasons for judgment that provided as follows:

> [F]irst of all, I note [Ms. Richard's] credibility and Ms. Piper's credibility.
>
> They answered the questions directly precisely, succinctly. They didn't elaborate, didn't try to pause to try to think of something other to say what they said. It was pretty spontaneous, and it made sense, and it was consistent. And their testimony was consistent with - - the testimonies were consistent between the two of them.
>
> Now, why Ms. Richard chose not to use the ramp, that I can't hold that against her. I don't think that she assumed the risk or she contributed to the injuries or to the fall.

Based on the testimony of the witnesses and the lights that are described under that canopy, under that awning, the eave or whatever one projects, illuminates out, and one down. You can see from those pictures that it would be that bumper, parking lot bumper, could be easily obscured or - - not necessarily invisible but not capable of being seen quite easily when that particular light is out.

That is not a - - it doesn't take a far stretch of the imagination to believe that. That bumper is close up against the curve and there's a little place between the curved sidewalk and that bumper. Looking at the photograph, that is not a great distance. It's probably less than a foot. I'm not sure. But just looking at the photographs, I could easily see how that could be concealed from sight in the darkness.

I believe the testimony of Ms. Richard and Ms. Piper. . . . I'm curious as to why someone didn't ask - - someone from the hospital to go and check - - take a look at that location either when it happened or the next day. No one did that.

I find in favor of Ms. Richard. Now, Ms. Richard had some issues prior to this fall, significant issues, but not involving her nose or - - I know there's some difficulty breathing with respiratory problems, but none involved the nasal passages prior to the event.

She's got restricted lung disease. So she did have a pre-existing condition in terms of the ability to breathe adequately and properly to inhale the oxygen she needs to exist; but this was made worse.

This accident made it worse, and her condition deteriorated as a result of that. It might have been in the natural process of getting worse, but this accelerated that decline. So it did affect her breathing ability; and you know, we take our victims as we find them.

She was not a proper candidate for surgery. She was adversely affected by this injury in terms of her breathing capabilities.

We're four years passed this event, and she has suffered. She has endured pain and suffering, and a lack of enjoyment of life, a deprivation of the enjoyment of life or alteration to her detriment in terms of her general health condition.

I'm mindful of her general health condition prior to the accident. I am mindful of that. Before the accident she was driving. I know that she had another automobile accident where she passed out. I don't know if it can be attributed to a combination of this particular accident on July 7th, 2014, and her overall health condition prior to and after that, it could be a contributory cause of her not receiving proper oxygenation.

The fact is that her breathing was affected as a result of this accident, and there were other problems caused as a result of that or additional problems, breathing problems as a result of the accident. I

9

was a little curious about when Ms. Richard went to see Dr. LeBert. She didn't bring it up, but he did because it was obvious to him that she had some kind of disfigurement and issue with her nostrils.

She didn't go out to try to make a case. It came up, and she did the best that she could to try to address it, and it didn't work as well as she hoped or she wanted to, but that's what we have.

So I find in her favor.

## *Liability*

In its first assigned error, WCCH contends that the trial court erred in finding it liable for Plaintiff's injuries.

In *Schindler Elevator Corp. v. Long Property Holdings, L.L.C.*, 50,199, pp. 11-12 (La.App. 2 Cir. 11/18/15), 182 So.3d 233, 240, the appellate court explained:

> The trial court's factual findings will not be disturbed on appeal absent manifest error. Moreover, the trial court's reasonable evaluations of credibility and inferences of fact will not be disturbed on review, even though the appellate court may believe its own evaluations and inferences are as reasonable. *Rosell v. ESCO,* 549 So.2d 840 (La.1989); *Monroe v. Physicians Behavioral Hosp., LLC,* 49,248 (La.App.2d Cir.8/13/14), 147 So.3d 787. The trial court reconciles conflicting evidence. The reviewing court does not determine whether the trial court was right or wrong, but whether its factual conclusions are reasonable in light of the record as a whole. *Stobart v. State, through DOTD,* 617 So.2d 880 (La.1993).

"When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Rosell*, 549 So.2d at 844. The Louisiana Supreme Court has gone so far as to declare that "[w]here the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous." *Snider v. La. Med. Mut. Ins. Co.*, 14-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323.

The trial court found Richard and her daughter to be very credible. Both testified that the light outside the Cornerstone door was not working and that the area between that exit and where Richard's car was parked was very dark. No contradictory evidence was presented by WCCH. Neither Ms. Conner, Mr. Cedars, nor Ms. Lyons inspected the area after Richard's fall and none of them had personal knowledge of whether the area was adequately illuminated when Richard fell. In *Wallace v. Slidell Mem'l Hosp.*, 509 So.2d 69, 72 (La.App. 1 Cir. 5/27/87), the appellate court affirmed the trial court's finding that the hospital and a contractor renovating the hospital were liable for the injuries that the plaintiff sustained in the hospital parking lot where it found that "inadequate lighting made it impossible for a potential victim to see the depressions, thus rendering the area unreasonably dangerous." We are convinced that the trial court's finding that WCCH was liable for Richard's injuries is not manifestly erroneous. WCCH's first assigned error has no merit.

### *Fault Allocation*

In its second assignment of error, WCCH submits that even if the trial court did not err in finding that it was at fault in causing Richard's injuries, it nonetheless erred in failing to assess any comparative fault to her. WCCH cites *Leonard v. Ryan's Family Steak Houses, Inc.*, 05-775 (La.App. 1 Cir. 6/21/06), 939 So.2d 401, in support of its claim that Richard should have been assigned some fault because she "made the conscious decision to step off the curb and not use the handicap ramp" that she had used when she exited her car earlier that evening.

"Like all factual findings, the standard of review of comparative fault allocations is that of manifest error. In determining fault, the trier of fact should consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." *Dufrene v. Gautreau*

11

*Family, LLC*, 07-467, pp. 17-18 (La.App. 5 Cir. 2/22/08), 980 So.2d 68, 80 (citations omitted), *writs denied,* 08-628, 08-629 (La. 5/9/08) 980 So.2d 694, 698.

In *Leonard*, 939 So.2d 401, the trial court assessed no fault to the elderly plaintiff who fell in the restaurant parking lot after stepping onto a broken, unanchored, and misaligned tire stop. The appellate court agreed that the tire stop presented an unreasonable risk harm to the restaurant's patrons but amended the judgment to assess the plaintiff with ten percent fault because it found that she "was in a position to avoid the accident" because she admitted that she "saw [the tire stop] before she stepped on it." In the instant case, Richard and her daughter testified that the area where her car was parked was very dark and not illuminated by any lights when they exited the hospital on the evening of July 7, 2014. The trial court stated that it believed their testimony and that it was clear from the photographs accepted into evidence that the "parking lot bumper[] could be easily obscured" because of the inadequate lighting. We have reviewed those photographs and find no manifest error in the trial court's ruling. Moreover, unlike the plaintiff in *Leonard*, Richard denied seeing the bumper before she fell.

Given the circumstances of Richard's accident, we find *Leonard* distinguishable from this matter. Accordingly, we find no manifest error in the trial court's failure to allocate fault to her. There is no merit to WCCH's second assignment of error.

### *Damage Award*

WCCH next asserts that the trial court's $50,000.00 general damage award was excessive "considering [Richard's] limited treatment and injuries."

"In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge[.]" La.Civ.Code art. 2324.1. "[E]ach award must be analyzed on a case-by-case basis to determine whether it is

adequate under the particular facts and circumstances presented by the case under review. " *Dufrene*, 980 So.2d at 82.

> The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion.

*Id.* at 81 (citations omitted) (quoting *Duncan v. Kansas City S. Ry. Co.,* 00-66, pp. 3-4 (La.10/30/00), 773 So.2d 670, 682-83).

The testimony and medical evidence indicate that Richard's health and lifestyle was inextricably changed for the worse after her fall in the WCCH parking lot. She now requires oxygen around the clock as a result of the deviated septum caused in this accident, and because she is not a candidate for surgery, her condition will not improve. Thus, we find no abuse of discretion in the amount of general damages the trial court awarded to Richard.

### *Does Damage Award Comport With Stipulation?*

In its final assignment of error, WCCH contends that the trial court erred in awarding Plaintiff the cost of her medical bills because it had entered into a stipulation with Plaintiff prior to the commencement of trial, that Plaintiff's damages did not exceed $50,000.00. Richard does not dispute that she entered into the foregoing stipulation.

In *Miller v. LAMMICO*, 07-1352, pp. 23-24 (La. 1/16/08), 973 So.2d 693, 708-09 (original footnotes omitted) (footnote added), the supreme court explained:

> [W]e find the language of La. C.C.P. art. 5 instructive with respect to stipulations entered into to avoid a jury trial. [4] La. C.C.P. article 5 provides that the plaintiff remits that portion of the claim not prayed for. If a plaintiff alleges that the amount in dispute does not exceed the

---

[4] Louisiana Code of Civil Procedure Article 5 provides: "When a plaintiff reduces his claim on a single cause of action to bring it within the jurisdiction of a court and judgment is rendered thereon, he remits the portion of his claim for which he did not pray for judgment, and is precluded thereafter from demanding it judicially."

jurisdictional limit, the court is without jurisdiction to render a judgment in excess of its jurisdictional limit. Similarly, a plaintiff's stipulation has the effect of a judicial admission or confession and binds all parties and the court. Accordingly, it follows that any damages in excess of the stipulated amount are remitted by the plaintiff's voluntary decision to enter into the stipulation, and thus in no instance could damages exceed the stipulated amount.

See also *Book v. State Farm Mut. Auto. Ins. Co.*, 02-1348, p. 3 (La.App. 3 Cir. 4/2/03), 843 So.2d 515, 517-18, in which this court repeated footnote one from *Benoit v. Allstate Ins. Co.*, 00-424, p. 1 (La. 11/28/00), 773 So.2d 702, 703, wherein the supreme court observed that:

> Because La.Code Civ. Proc. art. 1732 provides the situations in which a jury trial is not available, there is an awkward double negative in the statement of the monetary threshold, which prohibits a jury trial in '[a] suit where no individual petitioner's cause of action exceeds fifty thousand dollars exclusive of interest and costs.' That threshold clearly makes a jury unavailable unless the amount of at least one individual petitioner's cause of action exceeds $50,000.

In light of this jurisprudence, we conclude that the trial court erred in awarding Richard damages in excess of $50,000.00. Accordingly, the judgment will be amended to reduce Richard's total damage award to $50,000.00.

## DECREE

For the foregoing reasons, we amend the trial court judgment to reduce Richard's total damage award to $50,000.00. In all other respects, the judgment is affirmed. All costs of this appeal are assessed against Cameron Hospital Service District d/b/a West Calcasieu Cameron Hospital.

**AFFIRMED AS AMENDED.**