870 So.2d 1164 (2004)
Michael PETRANICK and his Wife, Karen Loup Petranick
v.
WHITE CONSOLIDATED INDUSTRIES, Karl S. Steimle and Reliance National Indemnity Company.
No. 03-CA-1424.
Court of Appeal of Louisiana, Fifth Circuit.
April 27, 2004.
Rehearing Denied May 14, 2004.
*1165 Jerald N. Andry Jr., New Orleans, LA, for Plaintiffs/Appellees/3rd Appellant.
Charles S. Green, Jr., New Orleans, LA, for Defendant/Appellant.
George J. Nalley, Jr., Christopher J. Stahulak, Metairie, LA, for Intervenor/Appellee/2nd Appellant.
Panel composed of Judges EDWARD A. DUFRESNE JR., JAMES L. CANNELLA, and THOMAS F. DALEY.
EDWARD A. DUFRESNE JR., Chief Judge.
This is an automobile accident case. Michael Petranick, plaintiff, was in the middle lane of a three lane limited access road, and traveling between 55 and 60 mph in a 50 mph zone. Karl Steimle, defendant, was entering the roadway from a merge lane on Petranick's right, and was traveling about 45 mph. Steimle testified that he was driving a company panel truck on the way to a job. He said that he successfully merged into the right lane, and then attempted to merge into the center lane. He said that he had his turn indicators on and looked both in his mirror and over his shoulder, but never saw Petranick's car before hitting it. Petranick also testified that he did not see Steimle coming into his lane until right before impact. Steimle was unhurt, but Petranick suffered lower back disc injuries and eventually underwent several surgeries.
Petranick sued Steimle, his employer White Consolidated Industries, and its insurer Reliance National Indemnity Co. Petranick's employer, Tulane Medical Center, intervened to recover worker's compensation benefits paid to Petranick.
A jury apportioned 65% of fault to Steimle and 35% of fault to Petranick, and awarded damages. The parties filed motions for JNOV and plaintiff's motion was *1166 granted in part. The Jury's judgment and that of the trial judge are as follows:

 JURY JUDGE
Comparative fault 35% to plaintiff 10% to plaintiff
 65% to defendant 90% to defendant
Pain and suffering $ 500,000 No change
Mental anguish $ 120,000 No change
Loss of enjoyment of life $ 90,500 No change
Disfigurement/disability $ 10,000 No change
Future lost wages $ 193,000 No change
Past lost wages $ 107,200 $ 186,114
Past medicals $ 82,000 $ 238,000
Future medicals $ 55,700 $ 147,522
Loss of consortium -0- $ 75,000
Total Damages $1,158,400 $1,560,136
Adjusted for % fault $ 752,960 $1,404,122

All parties now appeal.
The first issue concerns the apportionment of fault. The defendants urge that the 35% figure should be reinstated as to plaintiff, while the plaintiff seeks to have the 10% figure reduced to zero. A JNOV should not be granted when the evidence of record and reasonable inferences drawn from it are sufficient to convince a reasonable trier of fact that more probably than not a certain fact has been established. State DOTD v. Scramuzza, 95-786 (La. App 5th Cir. 4/30/96), 673 So.2d 1249. When a JNOV has been granted appellate courts review that decision based on the same standard. Id. Thus our inquiry is whether the trial judge properly determined that no reasonable fact finder could have reached the 35% figure. In this court's opinion he acted properly.
The facts of the accident are as recited above. There were no accident reconstruction experts presented, and the police report adds nothing to the litigant's testimony at trial. There is no question that a motorist merging into traffic or changing lanes has the duty to ascertain that it is safe to do so. Steimle testified that he simply did not see Petranick's vehicle before merging into the middle lane. It is clear that Steimle's failure to determine that he could safely change lanes was the major cause of the incident, and further that no reasonable fact finder could have found him only 65% at fault. On the other hand, Petranick admitted that he was driving 5 to 10 mph above the speed limit, and it was therefore reasonable to find him at least partially at fault, but certainly not 35%. Thus the trial judge properly set aside that finding.
The trial judge decided that a more reasonable apportionment was 90% to defendant and 10% to plaintiff. Our review of these findings is based on the manifest error standard, which also involves an analysis of whether a reasonable man could have made the findings of fact in question. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). As noted above, there was some negligence on the part of Petranick in speeding, but the major factor in the accident was Steimle's failure to see Petranick. When the actions of the parties are considered in light of the factors set forth in Watson, supra, we find nothing manifestly wrong in the trial judge apportioning fault at 90% and 10%. We therefore affirm those findings.
*1167 The remaining issues deal with the quantum of damages, and to assess those items requires a more detailed statement of plaintiff's pre-accident psychological problems, the nature of the original injuries, the effects of his two subsequent accidents of March 1, 2000 and May 4, 2001, and his overall medical course over this whole period.
Petranick is a home health care nurse. The evidence showed that he had been having employment problems in the months preceding the August 6, 1998, accident at issue here, and had become depressed about his and his wife's financial situation over the past three years. In May of 1998 he saw Dr. Patrick O'Neill, a psychiatrist, who diagnosed him as suffering from the first episode of a major depressive disorder. This doctor testified that because of the August 6, 1998, accident and subsequent medical problems Petranick had suffered additional episodes of depression and would probably need continuing treatment. He also said, however, that about 80% of people who suffer one episode of depressive disorder will suffer additional episodes. He prescribed Prozac for Petranick and referred him to Joan Rogers, a social worker, for psychotherapy.
Rogers testified that Petranick was doing well up to the time of the August accident, but due to that accident he became dramatically worse. She ascribed his continuing bouts of depression as being caused by this incident and his subsequent medical treatments, and said that he would need continuing psychological treatment. She also noted, however, that he became "pessimistic and negative" immediately after the second accident of March 1, 2000.
The medical procedures following the August 1998 accident were as follows. Immediately after the accident he was seen in a hospital emergency room for pains in his lower back. He was given anti inflammation medicine and discharged. At the time he was working for the Tulane Medical Center, and he was advised by this employer to see one of their neurologists, Dr. Morteza Shamsnia, for his continuing back pains as well as headaches and neck pains. This doctor followed him for several months during which the neck pain and headaches resolved, but the lower back pain continued. An MRI was then done which showed bulging in the discs at the L4-5 and L5-S1 levels. After a year of conservative treatment, plaintiff developed tingling and numbness in his leg, and an EMG showed a pinched nerve at the L5-S1 level. This doctor related the problem to the accident.
Also during this first year plaintiff had a recurrence of "tennis elbow" which did not respond to injections. Eventually surgery was done to correct the problem and this was a success. The orthopedist, Dr. Gregor Hoffman, related this problem to the accident of August 6, 1998.
Plaintiff was next seen by Dr. Dinh, a Tulane neurosurgeon. This doctor recommended surgery to remove some of the disc material at L5-S1 which was impinging on the nerve root. This was done on June 2, 1999, almost one year after theaccident. The procedure seemed to be a success initially, but after several months plaintiff had a recurrence of back pain.
Dr. Donald Dietze, a colleague of Dr. Dinh's and also a neurosurgeon, determined that the there was another bulge in the L5-S1 disc and that another surgery would be needed. During this procedure of October 27, 1999, more of the disc was removed, and a fusion was also done. This involved placing bone fragments in the space occupied by the disc where it would fuse and prevent further movement. Again, the procedure was initially a success *1168 and plaintiff was sent to physical therapy.
The second accident, a rear end collision, occurred on March 1, 2000. Bryan Soulie, plaintiff's physical therapists, testified that he saw him on the morning of March 1 before the accident and that he was doing well and reporting significant improvement in his back and decreasing pain. Then on March 6, plaintiff reported a flare up of pain in his back radiating into his legs, and also pain in his neck. However, Soulie said that his notes showed that these symptoms were short term, and he did not believe that the March 1, 2000, accident had had any effect on plaintiff's recovery. Dr. Dietze said that plaintiff mentioned the accident to him but he did not recall the details of plaintiff's description of the incident. His opinion was that he did not think that the March 1 accident had exacerbated plaintiff's problems, but he also could not say whether plaintiff would have needed further surgery if this second accident had not occurred. As noted earlier, Joan Rogers, the social worker who was giving him psychotherapy, reported that plaintiff was pessimistic and depressed after the March 1, 2000 accident. Plaintiff testified that he was not hurt in the March accident, but went to the emergency room as a precaution.
By June of 2000 plaintiff reported to Dr. Dietze increased back pain. The doctor thought there might be problems at the L4-5 level, and he was also interested in the progress of the prior fusion at L5-S1. On August 11, 2000, another surgery was performed. This time an incision was made in plaintiff's belly region and the internal organs were pushed to the side to expose the front side of the spinal column. Although the L5-S1 fusion had taken more bone was added to strengthen it. Plaintiff was then turned over and a fusion was done at the L4-5 level. Additionally, metal rods and screws were put in place to keep the fused areas from moving until both fusions had solidified further.
Dr. Dietze testified that the surgery took between six and eight hours to complete. He also noted that because of the front incision patients usually took four to six months to be able to do simple daily activities, and a year to return to normal health. In plaintiff's case the procedure was an apparent success and by January of 2001 he had reached maximum medical recovery, and was no longer in need of physical therapy.
Nonetheless, plaintiff began experiencing additional pain, and Dr. Dietze suspected that the rods and screws were causing this. Surgery was scheduled to do the removal, but just before this procedure plaintiff was in another accident on May 4, 2001. Plaintiff said he was not hurt in this incident, and the hardware removal was done a few days later as scheduled. This procedure was also a success. However, plaintiff developed a hernia in the area of the abdominal incision which required yet another procedure to repair. It further appears that this procedure did not succeed and that plaintiff will need further surgery with a fabric implant to rectify this problem.
There was a stipulation that the total medical bills at the time of trial were $238,000. However, defendants did not stipulate that they were liable for this total. It also appears that the bills up to the time of the second accident of March 1, 2000, were about $82,000, the amount awarded by the jury. In increasing the jury award to $238,000 the trial judge noted that this higher amount had been stipulated to. This was error for two reasons.
First, the trial judge misunderstood the nature of the stipulation which was only as to total expenses, but not liability for those *1169 expenses. Second, as noted in discussing the issue of comparative fault above, a JNOV is appropriate only where no reasonable person could have made a particular factual finding considering all the evidence. As the medical summary above shows, there were at least some indications that the accident of March 1, 2000, could have interrupted plaintiff's successful recovery from the first two back surgeries. Although there was considerable testimony and opinion that the second accident probably did not exacerbate the first, the jury was called upon to make the ultimate determination on this point. Judging from the amount it awarded for past medical expenses it is evident that they found the second accident as causative of the continuing back problems. Because this was a reasonable finding, the trial judge was in error in setting aside the $82,000 judgment for past medical bills, and we therefore reinstate that award.
Similarly the trial judge erred in increasing the future medicals from $55,700 to $147,522. The jury apparently found that some of plaintiff's future problems were related to the injuries sustained in the first accident, but some were also attributed to the second accident. This being a reasonable finding based on the evidence, we must also reinstate the award of $55,700.
Likewise, the jury's award for past loss wages apparently was also based on a finding that without the second accident plaintiff would have been able to return to work. We therefore reinstate the jury award of $107,200 for this item.
The next issue is the judge's award of $75,000 to plaintiff's wife for loss of consortium. Defendants urge that the award be eliminated as per the jury and plaintiffs argue for an increase. In this instance the judge was correct in determining the jury's decision to award her nothing was not reasonable on the record. It was shown at trial that the Petranick's have three children that had to be cared for and that the wife had to work outside the home to support the family during plaintiff's recovery. It was also undisputed that their marital relations were significantly interrupted and that she spent considerable time in caring for her husband during his convalescence. She also received some psychotherapy for depression during this period because of the strain of dealing with her husband's situation. Having determined that the wife is entitled to some compensation, the next inquiry is whether the judge abused his much discretion in fixing that amount at $75,000.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), the court reiterated the long standing rule that general damages are not susceptible to exact calculation and that the trier of fact has much discretion in fixing awards. On review the appellate court must consider the effects that a particular injury has had on a particular plaintiff considering his or her individual situation. It is only when the appellate court can determine for articulable reasons that an award is either too high or two low that it may adjust such an award. Moreover, the inquiry is not whether the appellate court would have made a particular award had it been hearing the case first hand, but rather whether the trier of fact has abused its discretion. In the present case, we are unable to articulate reasons why the $75,000 is too high or two low considering the impact that Petranick's injuries had on his wife, and we therefore must affirm that award.
The next issue concerns the general damage award of $500,000, which defendants contend is too high. This award was made by the jury and was not changed in the JNOV. As explained above, the question *1170 in reviewing general damage awards is whether the trier of fact abused its much discretion in fixing the amount of such awards considering all of the factors distinct to the plaintiff's injuries and situation. Here, plaintiff underwent at least two back surgeries and an elbow surgery because of the accident. There was also evidence that he suffered a recurrence of a major depressive disorder, for which he may need treatment for the foreseeable future. His life with his wife and children was completely disrupted and he was unable to support them for a protracted period, which deepened his depression.
In considering the above factors we are unable to articulate reasons why the award is excessive. While it is probably higher than this court might have awarded had he we been sitting as triers of fact, that is of no moment here. The issue is not what we would have awarded, but rather whether the jury abused its much discretion in its award. We find that it did not and so affirm that award.
The final issue is the jury's $193,000 award for future lost wages. Again, the trial judge did not amend this award. The evidence relating to plaintiff's future employability was presented by several of his doctors. Dr. Dietze said that plaintiff had reached maximum recovery, but he still would experience some pain probably for the rest of his life. He said that he could not lift more than 30 pounds and should avoid strenuous exercise, but otherwise he could probably do some medical case management type jobs. The doctor was concerned, however, that if he were on narcotic medications for pain and depression then he might not be fit for such work.
Dr. Kurt Gold, a physician in the field of physical medicine and rehabilitation, who is presently treating plaintiff at his new home in Nebraska, had a more optimistic view of plaintiff's condition. He thought he could lift up to 50 pounds, although he could not do bending and lifting. He was not concerned about pain medications and did not share Dr. Dietze apprehensions on that point. His opinion was that plaintiff could work in some capacity in the nursing field, although not in a treatment capacity.
Margo Hoffman, defendants' vocational rehabilitation consultant, testified that with plaintiff's restrictions as set forth by Dr. Gold he could find employment in the nursing field at salaries ranging from $28,000 to $50,000 per year. Plaintiff's expert economist, Bernard Pettingill, produced a number of projections based on a future work life expectancy of 25.5 years. His estimate of lost wages if plaintiff earned $49,000 per year would be about $21,000 over his working lifetime. Of course if plaintiff could not work at all his loss would have been over $1,000,000. The jury apparently found that plaintiff could not earn $49,000, but that he could indeed work for a reasonable wage. Although the figure of $193,000 does not appear in any of Mr. Pettingill's scenarios, it is a number that the jury could reasonably have reached based on the evidence and testimony. We therefore affirm this award as well.
For the foregoing reasons, the JNOV entered by the trial judge is affirmed in so far as he adjusted plaintiff's fault to 10% and defendant's fault to 90%, as well as his award of $75,000 to plaintiff's wife for loss of consortium. The jury verdict is reinstated as to past medicals, future medicals and past lost wages. In all other respects the jury verdict is affirmed.
AMENDED AND AFFIRMED AS AMENDED.