980 So.2d 68 (2008)
Michelle M. DUFRENE
v.
GAUTREAU FAMILY, LLC, Gulf South Management, Inc. and Lafayette Insurance Company.
Michelle M. Dufrene
v.
Gautreau Family LLC, Gulf South Managment, Inc. and Lafayette Insurance Company.
Nos. 07-CA-467, 07-CA-547.
Court of Appeal of Louisiana, Fifth Circuit.
February 22, 2008.
*72 Richard C. Trahant, T. Peter Breslin, Attorneys at Law, Metairie, LA, for Plaintiff/Appellee.
Bernard, Cassisa, Elliott & Davis, Howard B. Kaplan, Attorney at Law, Metairie, LA, Pelleteri, Wiedorn & Cooper, Raymond Pelleteri, Attorney at Law, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges SUSAN M. CHEHARDY, CLARENCE E. McMANUS, and FREDERICKA HOMBERG WICKER.
McMANUS, J.
In these consolidated appeals, the defendants appeal two judgments rendered in favor of plaintiff, the first awarding damages in plaintiff's personal injury suit, and the second imposing sanctions against defendants for failure to comply with discovery. For the reasons that follow, we affirm the judgments of the trial court.
Plaintiff, Michelle Dufrene Lassley, filed suit for damages on May 21, 2002, for injuries received when she fell in a stairway in Independence Mall, 4241 Veterans Blvd, Metairie, LA. Named as defendants in this suit were Gautreau Family, LLC ("Gautreau"), owner of the property; SRSA Gulf South Management. Inc. ("Gulf South"), responsible for the management and maintenance of the property; and United Fire and Casualty Co. ("United Fire/Lafayette"), Commercial General Liability insurance carrier for Gautreau Family, LLC.[1] After a four day trial on the merits, the jury found that the stairway contained a defect which presented an unreasonable risk of harm, and that defendants knew or should have known of the defect, that the defect contributed to plaintiff's accident, and that the accident caused plaintiff's injuries. The jury further found that plaintiff was 10% at fault in the cause of the accident. The jury awarded damages totaling $3,206,000.00, broken down as follows:

 Past and future pain and suffering $800,000.00
 Past and future mental anguish $750,000.00
 Past and future enjoyment of life $700,000.00
 Past medical expenses $312,000.00
 Future medical expenses $250,000.00
 Past lost wages $214,000.00
 Future lost earnings $180,000.00

The jury verdict was made the judgment of the court. After the denial of defendants' motion for JNOV/remittitur on December 21, 2006, defendants appealed.
After the trial court granted defendants' motion for appeal, plaintiff filed two motions for sanctions against United Fire/Lafayette. These motions alleged that defendants Gulf South and United Fire/Lafayette failed to identify and/or produce two applicable insurance policies until after trial, and only after the jury had returned a verdict in excess of the only insurance policy that had been produced. *73 The first motion sought sanctions pursuant to C.C.P. arts. 863 and 1471 for discovery abuses.[2] The second motion sought penalties pursuant to LSA-R.S. 22:1220.
The trial court rendered judgment on plaintiff's motion for sanctions pursuant to R.S. 22:1220. In the judgment, the trial court imposed sanctions of $10,000.00 against United Fire/Lafayette for its failure to produce the two policies. Defendants appealed from the award of sanctions.
In this appeal (07-CA-467 in this Court), defendants allege that the jury erred in finding that defendants knew or should have known of the defect in the stairway; that the jury erred in finding liability on the part of Gulf; that the jury erred in finding plaintiff only 10% at fault; that the general damage awards are grossly excessive; that the future medical award is grossly excessive; and that the jury was clearly wrong in awarding $180,000 in future lost wages.
In the second appeal (07-CA-547 in this Court), defendants allege that the jurisdiction of the trial court was divested by the signing of the motion for appeal, and therefore the judgment awarding sanctions was invalid. Alternatively, defendants argue that the trial court erred in finding that sanctions were warranted.
On motion of plaintiff, the two appeals were consolidated by this Court.

APPEAL 07-CA-467
On June 12, 2001, plaintiff was 35 years old. She was employed by Boise Cascade Co., as a salesperson, selling office supplies. On that date, she made a sales call on Troy Fields, who worked at Primerica located on the second floor of the Independence Mall. After the call, they decided to go to lunch. They decided to take the stairs instead of the elevator. Fields cautioned plaintiff to be careful because the steps were steep. There was a handrail on the right side of the staircase, but not on the left. Mr. Fields was on the right side, and plaintiff was next to him on the left. She was dressed in a suit with 2 and ½ inch heels. She had her sales catalog and day timer in her arms, and a purse over her shoulder. When she stepped off the last stair, she lost her balance and fell. She landed on her right knee and right hand. Her knees and hand were bleeding. She twisted her left ankle, and the outside of that ankle was bleeding as well. Mr. Fields helped her up and they went to the restaurant, where she got some ice for her ankle, however she did not eat lunch. In addition to her ankle, she said that she hurt all over.
She sought treatment two days later from Dr. Murphy because her ankle swelled and turned blue, and because she had pain in her back radiating down her legs and tingling in her hands.
At the trial, Bhola Dhume, an architect, who was employed by the City of New Orleans as Deputy Director of Department of Public Safety and Permits was qualified *74 as an expert in building codes and designs. He was retained by the defendants to inspect the stairwell. He stated that code regulations called for risers to be no more than 7 and ½ inches. Of the sixteen steps in this stairwell, 15 were out of code by varying amounts. The last step, which was the one that the plaintiff fell on, was 2 inches above maximum riser height. The difference between the last two steps was one and ½ inches. He concluded that the difference in the riser heights caused the accident.
Lloyd Gautreau, part owner and manager of Gautreau Family LLC testified that it purchased Independence Mall in 1996 or 1997. It was an existing shopping center when he bought it and he was not required to have the parish inspect it or to obtain an occupancy permit. His mortgage bank conducted an inspection and asked for certain repairs to the roof, however, it did not mention the stairwells. He went to the property about four or five times a month, and had walked the stairs in question.
Michael Hiferty, an employee of Gulf South, was the property manager assigned to Independence Mall. Before the accident in question, there had been some work done on the stairwell in question, involving changing the tread. At that time, he inspected all the stairwells. He did not inspect for code violations, and was not aware of the riser variances.
Wilfred Gautier was the maintenance engineer that Gulf South had placed at Independence Mall. He looked at the stairwell a few days before the accident, and repaired a stair tread in the middle stair. He was not aware of the code violations on the stairs, and did not measure any of the risers.
The following medical testimony was presented at the trial on the merits. Prior to the accident, plaintiff had fractured her sacroiliac twice, when she was 14 and 15 years old. As an adult, she had pulled a muscle doing exercise. She suffered one attack of vertigo; believed to be from a viral infection, about one month prior to the accident.
Two days after the accident, plaintiff sought treatment with Dr. Charles Murphy, an orthopedist. She reported twisting her ankle from falling down the stairs. On her next visit on June 21, 2001, her ankle was better, but her back was worse. Dr. Murphy ordered an MRI and physical therapy. On June 27, he recommended a second opinion and epidural steroid injections.
On July 2, plaintiff was admitted to the emergency room at Kenner Regional with intractable back pain. At that time, Dr. Murphy recommended evaluation with a neurosurgeon, a pain management specialist and a spinal injection specialist. At Kenner Regional, several tests were performed, including MRI scans, bone scans, and a trial of steroid injection. At discharge from the hospital, after three days, her diagnosis was acute worsening of low back pain with bilateral leg pain and numbness, with her left leg worse. Plaintiff's last visit with Dr. Murphy was September 13, 2001. She still had complaints of back pain at that time. He referred her to Dr. Lucian Moran for a neurosurgical appointment and Dr. Joseph Crapanzano for injection pain management. At trial, Dr. Murphy testified that her ankle sprain and low back pain related to her history of fall in stairwell.
Dr. Joseph Crapanzano, an anesthesiologist with pain medication subspecialty testified via video deposition. Since 2001 he's been practicing solely pain medicine. He first saw plaintiff on July 17, 2001. She had complaints of severe pain in her left lower lumbosacral region and possibly over her left sacroiliac joint. The results *75 of an MRI showed no significant lumbar disease. He performed a facet joint block injection on August 1, 2001. At plaintiff's next visit on August 9th, she reported a 20 to 30 percent decrease in pain; however she had sharp, burning, throbbing, constant pain over her left sacroiliac joint. He injected the sacroiliac joint, which gave her significant pain relief. On September 5, 2001, she received an epidural steroid injection which offered no relief. On Sept 16th, plaintiff was again admitted to the hospital. After the September 2001 hospital stay, Dr. Crapanzano did not see her for one year.
Plaintiff's next visit to Dr. Crapanzano was on was August 28, 2002. She complained of significant low back pain radiating into the buttocks. She was on serious pain medication. During the exam she was uncomfortable when she sat for any length of time. She appeared to be in moderate distress. Dr. Crapanzano treated her until February of 2003. During the whole time he treated her, no MRI of her sacroiliac joint was conducted.
At trial, Dr. Crapanzano testified that he considered the results of an arthogram conducted by plaintiff's current treating neurosurgeon, Dr. Dietz and the fact that the only treatment that afforded complete pain relief was the sacroiliac joint injection, and concluded that it was reasonable to believe that injury to the sacroiliac joint caused plaintiff's pain. He further opined that her injury and treatment related to fall, since there is no history of prior symptoms.
Dr. Gregory Dowd, neurosurgeon, testified via video deposition. He first saw plaintiff on Sept 16, 2001 in the Emergency Room, with complaints of severe intractable back pain. She had been taking a number of medications. He felt that length of time of pain warranted admission to the hospital. Plaintiff's hospital stay lasted from the 16th to the 21st of September. At that time, she underwent extensive testing, including MRIs, an EMG, and a myelogram. The tests failed to reveal any structure abnormality or infection. There was no testing of the sacroiliac joint. After discharge, he saw her on October 10, 2001. He noted that her pain had improved with physical therapy. Dr. Dowd testified that there was a chronological connection between her fall and the back pain. At trial, he further stated that the subsequent test result showing sacroiliac joint injury were consistent with her pain.
Dr. Donald Adams, a neurologist, testified that he saw plaintiff on Sept. 19, 2001, on a consultation for Dr. Dowd. She presented progressive and severe back pain that increased with activity and that was not controlled by medications. She related one episode of vertigo, which was thought to be a result of a viral infection. The vertigo had cleared up, and there was no reason to believe that vertigo caused the fall. Dr. Adams stated that all plaintiff's test results were normal and did not show a reason for pain. No testing on her sacroiliac joint was performed.
Dr. Rachel Murphy testified as an expert in internal medicine and acupuncture. She first saw plaintiff on May 15, 2002. She treated plaintiff until July 15, 2003. She first treated plaintiff with steroids and non-steroid medication injections, and later with a combination of acupuncture and medication. Plaintiff's condition showed improvement, but she never experienced total relief from pain. She was also on opiates and anti-depressants. Plaintiff did experience a 30 to 50% pain reduction where she could take less medications. Plaintiff always had low back pain and left hip pain, with pain radiating to her lower extremities. Dr. Murphy believed that plaintiff was experiencing disc problems, and she recommended a discogram. At *76 trial, Dr. Murphy stated that it can be difficult to determine whether the pain stems from injury to the L5-S1 disc or sacroiliac joint, and that plaintiff's symptoms were also consistent with sacroiliac joint dysfunction. Dr. Murphy related plaintiff's condition to her fall on June 12, 2001.
Dr. Elena Rada, an internal medicine physician practices in a group. Plaintiff began treatment with the group in February of 2002, and Dr. Rada first saw her on January 7, 2003. At that time, she had complaints of urinary tract infection and back pains. Dr. Rada saw plaintiff to monitor her liver and kidney functions relative to the medications that she was taking. She was on multiple medicines, including opiates, and one main concern was to keep her from becoming addicted. She was also anemic, and had some evidence of peptic ulcer disease. Some of the medications she was on were prone to gastro and urinary problems.
On March 26, 2002. Plaintiff was admitted to East Jefferson General Hospital with stress induced and medication induced gastritis. She was treated by Dr. McDonald, a gastroenterologist, and by Dr. David deBessonet for recurrent urinary tract infections. She was also treated her for contact dermatitis, a rash she developed from an anesthetic patch.
Dr. Rada testified that there was never a point in time where she felt that no further treatment was needed. She too referred plaintiff for physical therapy. Plaintiff's treatment with Dr. Rada was necessitated by all the medications prescribed. Dr. Rada stated that plaintiff never became dependent on the narcotics. Plaintiff stopped seeing Dr. Rada in the summer of 2005 when plaintiff moved to Denham Springs.
By the time of trial, plaintiff was being treated by a team of three medical professions, in a "team" approach. Dr. Donald Dietze, a neurological surgeon, first evaluated plaintiff on June 17, 2002, approximately one year after her accident. She related a history of a traumatic fall, and then injury, and therefore Dr. Dietz opined that the injury was related to the fall. At that time, she had already seen multiple physicians pursuant to instruction of Dr. Murphy, without significant benefit. She had been treated with various medications, physical therapy and intraspinal injections. He conducted various tests to try to diagnose and/or eliminate the cause of plaintiff's pain. On April 20, 2004, almost three years after the accident, Dr. Dietz performed an arthogram. That test consisted of putting a needle in synovial fluid around the sacroiliac joint and injecting dye. The results of the test showed leakage and elicited severe pain, similar to the pain she was trying to get rid of. He then diagnosed her with injury to the sacroiliac joint.
Dr. Dietz determine that because of the length of time that had passed, plaintiff's injury was not going to resolve on its own. Therefore plaintiff began receiving prolotherapy with Dr. Kramm, a physician specializing in physical medicine and rehabilitation, with a subspecialty in pain medicine, to strengthen the ligaments that support the joint, combined with physical therapy and chiropractic treatment. At the time of the trial, plaintiff was still under the care of Dr. Deitze, along with Dr. Robert Smith, a chiropractic internist, and Dr. Kramm. He stated that if plaintiff did not improve with prolotherapy, her options were spinal cord stimulator, or a sacroiliac joint fusion, both of which were treatments of last resort. He further testified that the sacroiliac joint fusion had a success rate of less than 50 percent. Dr. Dietze related the pain and the joint injury to the accident.
*77 Dr. Smith testified that he first saw the plaintiff on October 1, 2004, after she had been diagnosed with a fairly severe sacroiliac joint problem. He was still treating her at the time of trial. The untreated SI injury caused problems along entire spine. She has already had 275 treatments and may need 100 more. She had already incurred $25,000.00 in treatment expenses. Dr. Smith testified that he anticipated treatment continuing indefinitely into the future.
Dr. Paul Kramm testified that he first saw plaintiff in January of 2005, and was still treating her at the time of trial. On her first visit, he conducted a comprehensive initial examination and he also reviewed quite a few records. Plaintiff told him she fell down stairs and landed on her left knee. As a result she developed constant pain. She was on multiple pain medications, and had been on different narcotics for quite a while. She had seen several surgeons, and numerous specialists. Her main injury was to the pelvic area. An arthrogram showed injury in the sacroiliac joint in pelvis; however this diagnosis was not reached until three years after the accident. Dr. Kramm stated that this type of injury does not normally show up on MRI or CAT scan, and also probably would not have shown up in nuclear bone scan. Dr. Kramm opined that plaintiffs falling on the knee caused force that pushed the sacroiliac joint, causing it to get stuck in a bad position. This in turn pushed her spine out of alignment, causing twisting and creating inflammation all the way up the neck. Because of this injury, sitting or standing for any length of time causes pain. Injury to the sacroiliac join necessitates treatment of all joints of the pelvis, because the pelvis is a ring shaped structure, and once one joint gets "messed up" and goes untreated, they all get "messed up."
Dr. Kramm stated that he was treating plaintiff with prolotherapy, which is injecting sugar water to irritate, to try to find where the inflammation is, and to use that inflammation to promote healing. It uses a long spinal needle with X-ray, and usually involves 20 to 60 injections during one treatment. The procedure is very painful because it involves injecting an area that is chronically inflamed with an irritant. He stated that the majority of people would not want to undergo the intense pain; however a person who is in constant pain would consider the intense pain as a trade-off for pain-free time.
At the time of trial, plaintiff had undergone eleven rounds, and had received significant benefit. She had experienced two setbacks, the first time in March 2005, when she was involved in a car accident and the second right before trial, believed to be related to physical therapy. Dr. Kramm evaluated her improvement as 75% prior to the last setback.
Dr. Kramm stated at trial that psychological stress could trigger pain episodes, because it can tense muscles and lead to the joint getting out of place. He stated that plaintiff's description of the accident, stepping off a deep step and falling on her knee, is consistent with this type of injury.
Dr. Kramm opined that plaintiff would require five or six more rounds of prolotherapy. He further predicted that it would be 9 months to 1 year before she could return to work.
Dr. Kramm was one of plaintiff's doctors who advised plaintiff against having children. He stated that the stress to her pelvis area, along with the pregnancy hormone that relaxes the ligaments (that she is undergoing prolotherapy to tighten), would set her tremendously back. Furthermore, plaintiff needs several pain medications and muscle relaxers which could have an adverse effect on a fetus.
*78 Dr. Dietz testified that he had not yet discussed with plaintiff the possibility that her chronic pain could have resulted in permanent changes to her neuro circuitry. This could result in "phantom" symptoms, where the body has felt pain for so long that the nerves still continue to register pain, despite the resolution of the injury. This is similar to amputee patients, who still feel pain in amputated limbs.
Dr. Rada testified about the strong narcotics that plaintiff had been taking and the concerns to keep plaintiff from becoming an addict. Plaintiff also testified that this was a big concern, and she would refrain from taking medications to avoid this possible result. At trial, Dr. Rada testified that plaintiff never became dependent on narcotic medications.
Dr. John Cazale, an orthopedic surgeon, evaluated plaintiff on November 21, 2002 at the request of defendants. She related a history of a misstep on the last step, where she fell forward, and had no stair rail to grab onto. She suffered injury causing left ankle pain, shoulder pain, and back pain into both legs. She had MRIs of her lumbar spine and cervical spine, myelograms, CAT scans, an EMG nerve conduction study and a bone scan. His exam revealed no neurological deficit.
In his opinion, the sacroiliac joint is connected by very strong ligaments, which would need strong forces to disrupt, and falling on a knee could not create enough force to disrupt the joint. He further opined a sacroiliac joint fusion would cripple her.
At trial, plaintiff testified about the impact that the accident had on her life. In the five years between the accident and the trial, she had never been pain-free. Before the accident, she exercised four to five days a week.
Plaintiff testified that the pain sometimes caused anxiety and depression. She also testified about the frustration she endured when her condition remained undiagnosed, and when her care givers believed that pain was all in her head. She also stated that she regretted not being able to have children but that it was something she would have to live with. The plaintiff was 35 at the time of the accident and 40 at the time of trial
Her job involved carrying catalogs to customers. After the accident, she tried to continue working. She worked from her bed, with her phone and computer, and she relied on her regional manager and co-workers for the face-to-face meetings. She was able to work through the rest of 2001, and 2002, until February of 2003. She worked a "couple" of hours a day, a "couple" of days a week. In February of 2003, she was placed on family medical leave, and had not worked since. Her physician projected at trial that she would probably not be able to work for an additional nine months, and then she would be able to work part-time for three months. He anticipated her returning to full time employment in a year.
Plaintiff testified that in the five years since the accident, she had been treated by approximately 20 doctors. Initially, she sought treatment in Metairie, where she lived at the time of the accident. Because of the decrease in her salary, she become unable to afford her apartment, and she moved to her family home in Franklinton, and sought treatment with doctors in Mandeville. When she married, she moved to Denham Springs, and began treatment with doctors in Baton Rouge.
David Lassley is the plaintiff's husband. They met in June of 2003, two years after the accident. At first, he did not recognize the severity of her injuries. They were married in August of 2004. He stated that *79 she has good days and bad days. When she first wakes up in the morning, she walks like an elderly person and it takes her an hour to work out the stiffness. The plaintiff takes pain medication, and her pain level causes depression. They both were upset by the recommendation that she not have children. Mr. Lassley also testified that the litigation has been extremely detrimental.
Helen Lester, plaintiff's mother, testified that plaintiff was an active child who enjoyed sports, and that she did aerobics prior to the accident. It was three years after the accident before the plaintiff was diagnosed. During that time the plaintiff was upset and cried day and night. She did not know what was wrong with her, and she was getting worse instead of improving. She has had five years of medications. The injury robbed her of five years of life, where she has been unable to go places with her mom, sisters and step dad.

STANDARD OF REVIEW
In the case of Rabalais v. Nash, 06-0999 (La.3/9/07), 952 So.2d 653, 657, the Louisiana Supreme Court once again set forth the standard of review to be applied to factual determinations of the trial court:
It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Blair v. Tynes, 621 So.2d 591, 601 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). To reverse a fact-finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). Where the jury's findings are reasonable, in light of the record viewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court's ruling is manifestly erroneous, or clearly wrong. Blair, supra. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. See Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La. 1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Where there are two permissible views of the evidence, the fact-finder's choice cannot be manifestly erroneous or clearly wrong. Stobart, supra.

Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, where conflict exists in the testimony. Rosell, supra; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, supra.

ANALYSIS
In the first allegation of error, defendants argue that the plaintiffs did not prove notice of the defective condition.
LSA-C.C. art. 2317.1 states:

*80 The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.
A plaintiff alleging negligence under C.C. art. 2317.1 must prove the following elements: (1) that the defendant knew or should have known of the vice or defect; (2) that the damage could have been prevented by the exercise of reasonable care; and (3) that defendant failed to exercise such reasonable care. The addition of knowledge as an element has effectively eliminated strict liability in most circumstances. Cochran v. Safeguard Self-Storage, Inc., 02-1272 (La.App. 5 Cir. 4/29/03), 845 So.2d 1128.
In this case, the testimony established that there was a significant drop between the last step and the floor, and that drop had existed from the time of purchase of the property some 5 years before. The concept of constructive knowledge imposes a reasonable duty to discover apparent defects in things under the defendant's garde. Johnson v. Entergy Corp., 36,323 (La.App. 2 Cir. 9/20/02), 827 So.2d 1234. One is presumed to have constructive notice of a defect or dangerous condition when it is shown to have existed for such a long period of time that knowledge thereof can be presumed, or that it can be said that one should have had knowledge of the condition. Charan v. Bowman, 06-0882 (La.App. 1 Cir. 8/1/07), 965 So.2d 466, writ denied, 07-1773 (La. 11/9/07), 967 So.2d 505. The jury's finding on this element is subject to the manifest error standard of review on appeal. Charan, supra.
There does not appear to be manifest error in the jury's finding that defendants had knowledge, either actual or constructive, of the defect. Mr. Gautreau testified that he went to his property four or five times a month. He further stated that the stairways remained as they had been since he had purchased the property four or five years previously. The testimony of Mr. Hilferty and Mr. Gautier established that the stairway had been inspected less than a month prior to the accident.
In the second allegation of error, defendants allege that the trial court erred in finding any liability on Gulf South. Defendants argue simply that Gulf South did not own Independence Mall. They further allege that there is no evidence of independent fault on the part of Gulf South, and as with Gautreau, no evidence of notice.
Gulf South was responsible for the maintenance and care of Independence Mall, and therefore, was likewise responsible for the condition of the stairway on the date of plaintiff's accident. As with Gautreaux, it too had constructive notice of the defect that caused plaintiff's injuries, and the jury did not err in finding it liable along with the owner.
In their third allegation of error, the defendants argue that the trial court erred in assessing only 10% fault to the plaintiff. Like all factual findings, the standard of review of comparative fault allocations is that of manifest error. Phipps v. Allstate Ins. Co., 05-651 (La. App. 5 Cir. 2/27/06), 924 So.2d 1081. In determining fault, the trier of fact should consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Leonard v. *81 Ryan's Family Steak Houses, Inc., 05-0775 (La.App. 1 Cir. 6/21/06), 939 So.2d 401.
Defendant contends that plaintiff was contributorily negligent in that she did not use the handrail that was available, despite being told that the stairs were steep and despite having had a vertigo attack the month before. Plaintiff stated that she was very accustomed to using stairs, because she lived on the second floor and always took the stairs. She further testified that she would go up and down those stairs with boxes of samples which she would put in the trunk of her car. Furthermore, her vertigo had resolved and she was not dizzy when she fell. After reviewing the evidence at trial, we cannot find that the jury was manifestly erroneous in assessing 10% fault to the plaintiff.
In their fourth allegation of error, defendants argue that the general damages are grossly excessive.
The standard for appellate review of general damages has been stated by the Louisiana Supreme Court as:
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." Keeth v. Dept. of Pub. Safety & Transp., 618 So.2d 1154, 1160 (La.App. 2 Cir.1993). Vast discretion is accorded the trier of fact in fixing general damage awards. La. Civ.Code art. 2324.1; Hollenbeck v. Oceaneering Int., Inc., 96-0377, p. 13 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, 172. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260.
As we explained in Youn:
Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.
Id. at 1261.
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. National Emergency Serv., Inc., 99-0934 (La.10/29/99), 747 So.2d 1085, 1089; Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670, 682-683. See also Kaiser v. Hardin, 06-2092 (La.4/11/07), 953 So.2d 802, 808-809.
General damages awarded by the jury consisted of $800,000.00 for past and future pain and suffering, $750,000.00 for *82 past and future mental anguish and $700,000.00 for past and future enjoyment of life. Defendants allege that no reported judicial decision has awarded such an amount, and that the jury abused its discretion.
As we have noted, each award must be analyzed on a case-by-case basis to determine whether it is adequate under the particular facts and circumstances presented by the case under review. Hoyt v. Gray Ins. Co., 00-2517 (La.App. 4 Cir. 1/31/02), 809 So.2d 1076, 1084, writ denied 02-1222 (La.6/21/02), 819 So.2d 343, citing Youn, supra.
The jury awarded $800,000.00 for past and future pain and suffering. Plaintiff was an active 35-year-old at the time of the accident, who suffered an injury that severely limited her activities. She has been in constant pain for the last five years, and will experience pain for the rest of her life. The prolotherapy which she is now undergoing appears to be curing her, but she described the pain of the treatment as torture.
The jury awarded $750,000.00 for past and future mental anguish. The plaintiff suffered a debilitating injury which went undiagnosed for the first three years. At that time, she was seen by numerous physicians. She stated that she suffered emotional distress because some of them thought her symptoms were psychological. The unabated pain has caused fatigue, and she had been anxious about becoming addicted to the pain medications. In addition, she has lost the opportunity to have children, which is very upsetting to her and her husband.
The jury awarded $700,000.00 for past and future loss of enjoyment of life. Loss of enjoyment of life is recoverable as a separate element of general damages. McGee v. A C And S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770. In this case, plaintiff lived with significant pain from the time of the accident, and spent considerable time without knowing why or what her prognosis was. She was unable to work and to do the things she enjoyed doing.
Considering the evidence presented in this case, we cannot say that the jury was manifestly erroneous in its award of general damages.
In their fifth allegation of error, defendants argue that the award of future medical expenses in grossly excessive, and in their sixth allegation of error they allege that the jury was clearly wrong to award $180,000.00 in future lost wages.
The standard for special damages was stated as follows:
Special damages are those which have a "ready market value," such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages. McGee v. A C and S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770. In reviewing a jury's factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. Guillory v. Ins. Co. of North America, 96-1084 (La.4/8/97), 692 So.2d 1029.
Kaiser v. Hardin, supra at page 810.
With regard to future medical expenses, this Court has stated that:
Future medical expenses, as special damages, must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures will, more probably than not, be incurred as a result of the injury. Mendoza v. Mashburn, 99-499, 99-500 (La.App. 5 *83 Cir. 11/10/99), 747 So.2d 1159, writ not considered, 00-0040, 00-0043 (La.2/18/00), 754 So.2d 957, writ denied, 00-0037 (La.2/18/00), 754 So.2d 976. The plaintiff bears the burden of proving entitlement to future medical expenses by a preponderance of the evidence. Id. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. LeMasters v. Boyd Gaming Corp., 04-1054 (La.App. 5 Cir. 2/15/05), 898 So.2d 497, writ denied, 05-0751 (La.5/6/05), 901 So.2d 1103. Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony. Green v. K-Mart Corp., 03-2495 (La.5/25/04), 874 So.2d 838, 843. A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. Id.

Harvin v. ANPAC Louisiana Ins. Co., 06-204 (La.App. 5 Cir. 10/17/06), 944 So.2d 648, 654, writ denied 06-2729 (La.1/8/07), 948 So.2d 134.
The jury awarded $250,000.00 in future medical expenses. Defendants argue that this award is not supported by the evidence at trial. Defendants further argue that plaintiff did not prove that it was more probable than not that she would undergo SI joint fusion and therefore the cost for future surgery could not be included in the award.
The testimony at trial established that plaintiff needed a continued course of prolotherapy at a cost of about $49,000.00, and continued chiropractic treatment, which Dr. Smith predicted would continue indefinitely into the future. In addition, testimony established the continued need for medications and physical therapy, continuing treatment with the team of three doctors, and others as would be needed.
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. La. C.C.P. art. 2164.
Stiles v. K Mart Co., 597 So.2d 1012, 1013 (La.1992).
Considering the testimony of the need for future medical treatment, and the award for past medical expenses, we find that the award for future medical expenses is not excessive.
In this appeal, the defendants also challenge the award of future lost wages.
Special damages, which are those damages that can be established to a reasonable mathematical certainty, include awards for past and future lost earnings. Myers v. Broussard, 96-1634 (La.App. 3 Cir. 5/21/97), 696 So.2d 88. When a trier of fact assesses special damages, the discretion is more limited or narrower than the discretion to assess general damages. Eddy v. Litton, 586 So.2d 670 (La.App. 2 Cir.1991), writ denied, 590 So.2d 1203 (La.1992). The standard of review, however, is still that of abuse of discretion. Wainwright v. Fontenot, 00-492 (La.10/17/00), 774 So.2d 70.
Cottle v. Conagra Poultry Co., 06-1160 (La.App. 3 Cir. 3/14/07), 954 So.2d 255, 257-258.
The jury awarded $214,000.00 for past lost wages and $180,000.00 for future lost earnings.
Robert Skinner, CPA, testified that he calculated plaintiff's past and future lost *84 wages, based on what she had been earning at the time of the accident, what she had earned after the accident, and utilizing the doctor's estimate that plaintiff would be out of work for an additional nine months, and then would work part-time for an additional three months, before returning to full time employment one year post trial. He concluded that plaintiff's past lost wages totaled $213,921.00 and her future lost wages equaled $54,666.00.
Mr. Skinner's calculations were based on her returning to work in one year. This one-year period was based on the hopeful estimates of plaintiff's treating physicians. These calculations did not consider the real possibility that plaintiff would need a longer period before returning to work, nor did they factor in lost wages in the future because of missed work, despite the fact that plaintiff's physicians testified that she would have pain for the rest of her life. Mr. Skinner further stated that he did not factor in any bonuses or incentives in his calculations. Mr. Skinner was the only person to testify as to plaintiff's lost past and future wages.
The jury, considering the evidence, could well have concluded that it was likely that plaintiff would not be able to return to work within a year from trial, and therefore would suffer lost wages in excess of those calculated by Mr. Skinner. The award of $180,000 is an award that that the jury could reasonably have reached based on the evidence and testimony. Compare Petranick v. White Consolidated Industries, 03-1424 (La.App. 5 Cir. 4/27/04), 870 So.2d 1164, writ denied, 04-1487 (La.9/24/04), 882 So.2d 1130. We cannot say that the jury was manifestly erroneous in its award of special damages.

APPEAL 07-CA-547
In this appeal, defendants argue that the trial court did not have jurisdiction to hear plaintiff's motion for sanctions pursuant to LSA-R.S. 22:1220. Defendants further argue that the trial court had no legal basis for the sanctions awarded, and further that plaintiff has shown no prejudice sufficient to justify the award.
In response to discovery in this matter, defendants produced evidence of one commercial general liability policy insuring the property on which plaintiff was injured. After trial, defendants produced two additional policies, in which Gulf South Management is the named insured. All three policies were issued by the same insurer.
Plaintiffs filed two motions, one entitled Plaintiff's Motion for Penalties Pursuant to LSA-R.S. 22:1220 (which is the subject of this appeal), and one entitled Plaintiff's Motions for Sanctions and Request for Evidentiary Hearing. The trial court granted plaintiff's motion for appeal on January 12, 2007. On June 12, 2007, the court held a hearing on the motion for sanctions pursuant to 22:1220. The trial court rendered judgment on June 18, 2007 awarding sanctions of $10,000.00 against Lafayette for its failure to produce the two policies.
According to LSA-C.C.P. art. 2088, the only matters removed from the jurisdiction of the trial court are those matters reviewable on appeal. Art.2088 contains a list of enumerated exceptions to the divestment of the trial court's jurisdiction once an appeal has been perfected; however, that list is not exclusive. Oreman v. Oreman, 07-296 (La.App. 5 Cir. 10/30/07), 971 So.2d 1149; Blanchard v. Missouri Pacific R. Co., 95-1385 (La.App. 3 Cir. 6/26/96), 676 So.2d 779, writ denied, 96-1950 (La.11/1/96), 681 So.2d 1269.
The motion for sanctions that was heard, and granted, after the motion for appeal does not present issues reviewable in that appeal, and therefore the trial court was *85 not barred from hearing the matter by LSAC.C.P. art.2088.
Prior to the lodging of the second appeal, on July 5, 2007, the plaintiff filed a motion for partial remand, requesting that this Court remand this matter to the trial court for the purpose of ruling on the motion for sanctions for failure to comply with discovery. This Court denied the motion, referring the matter to the case on the merits on July 6, 2007.
LSA-R.S. 22:1220 provides:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
* * *
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
* * *
Misrepresentation can occur when an insurer either makes untrue statements to an insured concerning pertinent facts or fails to divulge pertinent facts to the insured. McGee v. Omni Ins. Co., 02-1012 (La.App. 3 Cir. 3/5/03), 840 So.2d 1248, writ denied, 03-1375, 03-1382 (La.12/12/03), 860 So.2d 1149.
In response to discovery, defendants failed to produce two policies that provided coverage. This constitutes misrepresentation sufficient to warrant the imposition of penalties.
Defendants next argue that plaintiffs failed to prove damages, and therefore they were not entitled to a penalty award.
In the case of Sultana Corp. v. Jewelers Mut. Ins. Co., 03-0360 (La.12/3/03), 860 So.2d 1112, the court determined that requiring the insured or claimant to prove general or special damages as a prerequisite to the award of penalties interjects a requirement not provided in the statute, and therefore proof of actual damages is not a prerequisite to the recovery of penalties for insurer's breach of statutory duties of good faith and fair dealing and fair and prompt adjustment of claims. In Gilpin v. State Farm Mut. Auto. Ins. Co., 99-36 (La.App. 5 Cir. 5/19/99), 735 So.2d 921, we said that the total maximum penalty award, when there is no proof of damages caused by the breach of the insurer's duty to settle claims in good faith under R.S. 22:1220, is $5,000.00.
Just as the statute does not require damages for an assessment of penalties pursuant to LSAR.S. 22:1220, there is no requirement that the insured make a showing of prejudice before penalties can be assessed.
We find no error in the trial court's award of penalties pursuant to LSA-R.S. 22:1220.
*86 For the above discussed reasons, the judgments of the trial court are affirmed. The motion for remand is dismissed as moot.
AFFIRMED; MOTION FOR REMAND MOOT.
NOTES
[1] Lafayette Insurance Company was the named defendant in plaintiff's petition. United Fire and Casualty Co., Gautreau's insurer, answered the petition and defended both Gautreau and Gulf South. Lafayette Insurance Company is a subsidiary of United Fire, and had issued two liability policies for Gulf South. As United Fire provides coverage by its own policy and through policies issued by its subsidiary Lafayette Insurance Company, these defendants will be referred to as United Fire/Lafayette.
[2] After the lodging of the first appeal with this Court, but prior to the lodging of the second appeal, the plaintiff filed a motion for partial remand, requesting that this court remand this matter to the trial court for the purpose of ruling on the motion for sanctions for failure to comply with discovery. This court denied the motion, referring the matter to the case on the merits on July 6, 2007. After this Court denied the motion for partial remand, plaintiff filed a motion to reset the motion for sanctions and evidentiary hearing in the trial court. The trial court granted the motion to reset, finding that the court it did retain jurisdiction to hear the issues of sanctions and contempt. An application for writ of review from that decision was filed with this Court, Dufrene v. Gautreau, 07-C-787.