NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2022 CA 0451

COURTNEY D. GRAY AND SHANA M. GRAY

VERSUS

UV LOGISTICS, LLC, D/B/A UNITED VISION LOGISTICS, ALBERT
KNIGHT, SR., INDIVIDUALLY AND/OR D/B/A AK TRUCKING, LLC,
DIAMOND TANK RENTALS, INC, ABC INSURANCE COMPANY, DEF
INSURANCE COMPANY, AND GHI INSURANCE COMPANY

*Judgment Rendered:*  NOV 1 7 2022

\* \* \* \* \* \* \* \*

Appealed from the
16th Judicial District Court
In and for the Parish of St. Mary
State of Louisiana
Case No. 128,324, Division C

The Honorable Vincent J. Borne, Judge Presiding

\* \* \* \* \* \* \* \*

| | |
|---|---|
| Arthur D. Dupré<br>Jacob P. Van Wynen<br>Metairie, Louisiana | Counsel for Plaintiffs/Appellants<br>Courtney D. Gray and<br>Shana M. Gray |
| Frederic C. Fondren<br>Charles G. Blaize, Jr.<br>Houma, Louisiana | Counsel for Defendants/Appellees<br>UV Logistics, LLC, d/b/a United<br>Vision Logistics, Albert Knight, Sr.,<br>and AK Trucking, LLC |

Chutz, J Concurs

\* \* \* \* \* \* \* \*

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**THERIOT, J.**

In this suit arising out of injuries sustained in an incident involving a tractor trailer winch, plaintiffs-appellants, Courtney D. Gray ("Gray") and Shana M. Gray (collectively "the Grays"), appeal the trial court's July 29, 2021 judgment, finding Gray was 70% at fault for failure to properly report maintenance issues with the trailer and in causing the accident and resulting injuries; finding defendant-appellee, Albert Knight d/b/a AK Trucking ("Knight"), was 30% at fault for failing to maintain his trailers when previously informed there was an issue with the trailer and its appurtenances; and further finding defendant-appellee, UV Logistics, LLC d/b/a United Vision Logistics ("UVL"), was vicariously liable for the actions of Knight. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Gray undisputedly worked as a truck driver for Knight. An Independent Contractor Operating Agreement exists between Knight, as contractor, and UVL, as carrier, whereby Knight provided UVL the use of certain equipment, including tractors and trailers, along with one or more professional truck drivers and other incidental transportation-related services.

On April 6, 2014, Gray was using a winch bar to tighten a load on a trailer, which was being used to haul cutting boxes secured by straps. Gray inserted the winch bar into the winch and was pushing down on the winch bar. Toward the end of tensioning the strap, Gray placed two hands on the winch bar and pushed down in his last attempt to get it tighter. However, the winch allegedly spun and broke, and the winch bar came up, striking him on the right side of his forehead.

On April 6, 2015, the Grays filed a Petition for Damages, naming UVL, Albert Knight, Sr., individually and/or d/b/a AK Trucking, LLC, and various

2

insurers as defendants.[1] The Grays asserted defendants' negligence caused Gray's injuries and damages.

Trial on the merits was held on June 28-30, 2021. In a judgment signed July 29, 2021, the trial court found Gray was "seventy (70%) percent at fault for failure to properly report maintenance issues with the trailer and in causing the accident and resulting injuries." The trial court found Knight was "thirty (30%) percent at fault in failing to maintain his trailers when previously informed that there was an issue with the trailer and its appurtenances" and further found UVL was "vicariously liable for the actions of Albert Knight d/b/a AK Trucking, LLC, under the trucking agreements between the parties." In the judgment, the trial court made various damage awards to the Grays and noted that said amounts were "to be reduced by seventy (70%) percent for the fault of Courtney Gray."

In written reasons for judgment, the trial court noted Gray testified that, when he was winching, he had two hands on the bar and his head was over the bar; thus, the trial court found Gray failed to follow the proper winching procedure contributing to the cause of his injuries. Additionally, the trial court found Gray failed to follow the rules on reporting maintenance issues for Department of Transportation ("DOT"), as well as UVL. The trial court further noted Gray's failure to report to his treating physician two accidents, which occurred while he was recovering from neck surgery and exacerbated his injuries, protracted Gray's recovery from the instant injury. The trial court further noted Gray failed to complete physical therapy and continues to take narcotic pain medication seven years post-accident, contributing to his failure to obtain gainful employment. Referencing the findings of Dr. Christopher Cenac, the trial court noted Gray

---

[1] The Grays also named Diamond Tank Rentals, Inc. ("Diamond") as a defendant, as Gray allegedly was picking up the load of cutting boxes from Diamond on the date of the incident. Diamond filed an unopposed motion to dismiss, which the trial court granted on February 23, 2016.

3

should have had a psychological assessment prior to the surgery to discern if he would be a successful candidate for the surgery, which has led to Gray having an opioid addiction. Thus, the trial court outlined in its written reasons that Gray was "seventy (70%) percent at fault in causing the accident and resulting injuries for failure to follow proper safety rules for winching, follow DOT regulations and mitigating [sic] his damages," Knight was 30% at fault in failing to maintain his trailers, and UVL was vicariously liable with Knight.

On August 9, 2021, the Grays filed a motion for new trial, asking that the trial court reduce Gray's allocation of fault. On August 16, 2021, UVL and Knight likewise filed a motion for new trial. On November 29, 2021, the trial court signed a judgment, denying both motions for new trial.

The Grays appeal the trial court's July 29, 2021 judgment. In their first and second assignments of error, taken together, the Grays assert the trial court was manifestly erroneous and erred in allocating 70% of fault to Gray because there is no factual basis in the trial record for such an allocation and the trial court record clearly establishes that such an allocation of fault is manifestly erroneous.

## DISCUSSION

The Grays argue the trial court misconstrued Gray's testimony as to the placement of his head at the time of the incident, no OSHA standard or regulation prohibited the use of both hands on the winch bar, and Gray was unaware of any winch problems to report before the incident. The Grays further argue the trial court was manifestly erroneous in concluding he failed to mitigate his damages.

Preliminarily, we note that, although the trial court's written reasons stated Gray was 70% at fault "in causing the accident and resulting injuries for failure to follow proper safety rules for winching, follow DOT regulations and mitigating [sic] his damages," the July 29, 2021 judgment from which the Grays appeal does not include a finding that Gray failed to mitigate his damages. Moreover, neither

4

the reasons nor the judgment state how much (if any) the various damage awards were reduced for failure to mitigate damages, and none of the parties have appealed, asking this court to reduce damages for failure to mitigate. Where there is a discrepancy between the judgment and the reasons for judgment, the judgment prevails. **Scoggins v. Frederick**, 98-1814, p. 3 (La. App. 1st Cir. 9/24/99), 744 So.2d 676, 680, n. 4, <u>writ denied</u>, 1999-3557 (La. 3/17/00), 756 So.2d 1141. Accordingly, as the appealed judgment does not reflect either a finding that Gray failed to mitigate his damages or a reduction of damages therefor, we find the judgment prevails, and the issue of failure to mitigate damages is not before this court.

As to Gray's comparative fault, La. Civ. Code art. 2323(A) states:

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

The allocation of fault between comparatively negligent parties is a finding of fact. **Sims v. State Farm Automobile Insurance Co.**, 98-1613, p. 2 (La. 3/2/99), 731 So.2d 197, 199. The supreme court in **Watson v. State Farm Fire and Casualty Insurance Co.**, 469 So.2d 967, 974 (La. 1985) set forth guidelines for apportioning fault under the doctrine of comparative negligence, as follows:

> In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the

5

significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

Like all factual findings, the standard of review of comparative fault allocations is that of manifest error. **Leonard v. Ryan's Family Steak Houses, Inc.**, 2005-0775, p. 13 (La. App. 1st Cir. 6/21/06), 939 So.2d 401, 410. The supreme court has announced a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). See **Stobart v. State through Department of Transportation and Development**, 617 So.2d 880, 882 (La. 1993).

The manifest error standard demands great deference to the fact finder's conclusions; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. **Schexnayder v. Bridges**, 2015-0786, p. 13 (La. App. 1st Cir. 2/26/16), 190 So.3d 764, 773. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. **Id.** If an appellate court finds a clearly wrong allocation of fault, the court should adjust the award, but then only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the fact finder's discretion. **Id.** at 773-74.

Trial testimony reflects that, on April 6, 2014, Gray inserted the winch bar into the winch and was pushing down on the winch bar. Gray testified that he placed his hand on the trailer to make sure he was balanced and then he came down with the bar a couple of times. He said he then placed both hands on the bar

6

and was pushing down to get it "extra tight." Bob Tindell ("Tindell"), another driver who witnessed the incident, testified that Gray's back was straight, and he was pushing down with his arms, using a little body weight and his knees for leverage. Tindell noted Gray was pushing for the last few clicks, which is the end of tightening a strap when extra tension is needed. However, the winch bar came back up striking Gray on the right side of his forehead. Gray testified he was wearing a hard hat, which was knocked off.

Gray attended orientation with UVL twice, on July 19, 2011 and February 5, 2014. Glenn Gary ("Glenn"), a UVL trainer and safety manager, testified at trial that, in his training class, drivers are taught to face the trailer with the winch bar off to the right, if they are right-handed.[2] They are told to then stabilize themselves on the trailer by grabbing the rub rail and properly tension the bar with the other hand. Glenn testified "[t]he driver is responsible for their own safety by their actions."

A PowerPoint presentation used in UVL's driver training on load securement outlined the following: "Use proper body positioning. Keep both feet firmly planted on the ground and push with your arms and back. Do not put all your weight over the bar!" Glenn testified the use of the plural word "arms" was a misspelling, and they "never train for two arms on the bar." Glenn testified the PowerPoint refers to both the left and right arm (i.e., whatever arm is used depending on whether one is left or right-handed) and does not reference two arms or two hands on the bar at the same time. Glenn agreed the instruction contemplates a person's arm and shoulder would be over the bar when the winch bar is properly being used to produce whatever tension or pressure is needed.

---

[2] Gray is right-handed.

Glenn agreed there can be stylistic variations "[a]s long as you follow the body positioning ... referred to earlier." As to placing a second hand on the bar toward the end of tightening the strap, Glenn stated the biggest problem with that is a driver has no way to stabilize himself if something fails. Glenn noted the reason they tell the driver to place one hand on the trailer is to stabilize themselves if the bar gives way or the winch gives way or the strap fails and to prevent the driver from "slamming against the side of the trailer and busting a head." When asked if it was acceptable procedure and proper for a driver, when tensioning a load, to take his hand off the trailer for the last two clicks if he stabilizes himself in a sturdy stance and uses two hands to put the last bit of pressure on the bar, Glenn responded, "No. ... we don't train that way." As to body positioning while winching, Glenn further testified:

Q: And so if you're standing there like what you demonstrated before, your arm and your shoulder are over the winch?
A: Yes, they were.
Q: But your body is not, is it, the rest of your body?
A: No.
Q: Your face isn't?
A: No.
Q: Your torso?
A: I'm looking straight at the winch and watching the winch.
Q: So if you're facing forward, than that winch is on the side of your body and you're pushing it down with your arm, if that winch for whatever reason pops up, where does it go?
A: There are – if it break, it goes down.
Q: To the ground or right here (indicating)?
A: Uh-huh.
Q: Not here (indicating), right?
A: It shouldn't.
Q: Is that why you teach that?
A: Yes, because there have been injuries where the drivers have improperly used bars in the past. I've seen some pretty nasty injuries in that. So we've had to hammer down on keep your body and face away from the winch bar. Keep the winch bar off to your right. Most of these guys are right handed and even left handers, most of them will do it with the right hand so they can control and keep an eye on the gear on the left -hand side.

In his trial testimony, Stanley Burney ("Burney"), a former contract driver for UVL who collected Gray's load after the incident, likewise agreed drivers are instructed on the proper way to bind down a load and are told not to have their head or face anywhere near the bar. When asked if he had used two hands to crank down on the bar, Burney stated he had done so. However, when asked whether the bar flies up when it breaks, and hits a driver upside the head, Burney responded, "Sometimes if you ain't careful if you ain't doing it right."

Additionally, when asked what would happen in the event of a failure within a winch (e.g., the pawl fails), Glenn testified that the bar will only come back up if the person tensioning the bar actually dropped the bar or let go of it; otherwise, it would remain in the palm of their hand. He maintained the only way the bar is going to come back up is if the driver releases the tension on the bar; thus, he trains drivers to have the presence of mind to always hold onto the bar. When asked whether a driver is expected to hold onto the bar with a sudden surprise of an upward surge of energy, Glenn explained there is no more energy coming back up with the bar than the driver is applying directly to it, so it does not surge, create, or increase energy and further does not increase in the amount of pressure, tension, or surge. Glenn testified they train the drivers to never let go of the bar until they know the pawl has been engaged. When asked whether the tension on the strap would come flying up if the pawl did not catch the gear when a driver cranks down on the last few clicks, Glenn maintained it was never going to have more pressure than the driver actually applied himself and does not generate pressure. Glenn testified that if a driver is surprised, then that means they are not staying focused on the pressure that is on the bar that they are applying. Glenn agreed a driver should never be surprised by the amount of tension that is being put on a winch or strap, as they are putting the pressure on the winch themselves. Per Glenn, the "driver is responsible for their own safety by their actions."

In his trial testimony, Gray agreed he was taught to place his left hand on the truck and use his right hand and shoulder to push down the bar, and Gray further agreed he was taught to keep his head "[a]way from the bar." As to the position of his head at the time of the incident, Gray testified:

Q: What part of your body did the winch bar hit?
A: It hit my head.
Q: Was your head over the bar?
A. My right – the right side of my head. No, sir, my head wasn't over the bar.

When asked if any part of Gray's body, including his head, was over the winch bar, Tindell responded, "No, sir. No, sir." Nevertheless, in his deposition introduced into evidence at trial, Charles Prewitt, P.E., the Grays' consulting engineer, testified:

Q: And so if you're not leaning your face and head over the bar and something happens to make the bar pop up, what happens?
A: Well, I don't know that he had his head and face over the bar. He had it obviously close enough that it hit him.
...
Q: You have to be too close to the bar for it to hit you in the forehead, don't you?
...
A: You would have to be close enough to it to hit, yeah. That's obvious.
Q: And the point is to not be so close to it so that it hits you in the head to operate the bar safely; is that correct?
A: Well, that's the idea, yes.
Q: So if you consider getting too close to it user error, that's a possibility in this case; isn't it?
A: If – yeah, that's certainly a possibility. I would – (Nods head).
    MR. VAN WYNEN:
    Are you saying in the event of a failure or just normal operation?
    MR. FONDREN:
    Either way.
BY MR. FONDREN:
Q: Either way.
A: Like I said, I think it's – it's --- yeah, that's true. He would have had to have been about the bar for it to hit him. Unless he pulled it out and hit himself in the head. And I don't think he did that.

Furthermore, Gray undisputedly had two hands on the winch bar, when the incident happened, and was pushing the bar down. In his trial testimony, Gray

10

agreed that, as a driver, it was his responsibility to be aware of what he is doing, the position of his body, and everything else while binding down a load. Gray agreed that no one can look out for his safety but him.

Glenn further testified that training also covers a driver's responsibility relative to completing pre and post-trip logs, which document the pre-trip inspection and the post-trip inspection. Glenn stated that drivers are instructed how to complete the log, which is a DOT required document. Glenn testified that a pre-trip visual inspection may not detect a problem with a winch; however, if the driver used the winch and had problems with it, then he would be obligated to indicate this on the post-trip driver's log. Glenn agreed that his instruction to the driver doing the training would be that, if issues were not noted, then drivers are violating company policy and the law. Glenn pointed out that defects must be documented, even if the truck owner does the repairs.

The Driver's Daily Log included a section captioned as "Driver's Daily Vehicle Inspection Report Required by the D.O.T. Safety Regulations – Part 396."[3] The log directs drivers to "CHECK ANY DEFECTIVE ITEM AND, IF NECESSARY, GIVE DETAILS UNDER 'REMARKS'." Although the log does not expressly list winches, it includes "OTHER PARTS AND ACCESSORIES AS

---

[3] 49 CFR 396.11(a)(2)-(3) titled "Driver vehicle inspection report(s)" states, in pertinent part:

(2) Report content.

(i) The report must identify the vehicle and list any defect or deficiency discovered by or reported to the driver which would affect the safety of operation of the vehicle or result in its mechanical breakdown. ...

(3) Corrective action.

(i) Prior to requiring or permitting a driver to operate a vehicle, every motor carrier or its agent shall repair any defect or deficiency listed on the driver vehicle inspection report which would be likely to affect the safety of operation of the vehicle.

(ii) Every motor carrier or its agent shall certify on the driver vehicle inspection report which lists any defect or deficiency that the defect or deficiency has been repaired or that repair is unnecessary before the vehicle is operated again. ...

REQUIRED BY DOT AND/OR COMPANY POLICY," and the trial witnesses agreed a defective winch could be noted on the log. Drivers are required to sign the Driver's Daily Log, which notes "I HAVE INSPECTED THE ABOVE EQUIPMENT AND INDICATED ALL NOTICEABLE DEFECTS."

Tindell testified that, prior to the incident, he had been using the trailer at issue for six months to a year, and he had experienced problems with winches spinning including the subject winch, which he stated was "skipping and trying to slow you down." Tindell testified that he told Knight he needed to fix the winches, as they were worn out, and Knight said he would take care of it. However, Tindell did not note any of those malfunctions on the daily log, asserting Knight told him not to do so. Tindell testified Knight told drivers not to write down or make notes of maintenance and repair issues and told them to give them to him verbally. When asked to explain why they were not "allowed" to make notations of maintenance and repairs needed, Tindell stated, "[W]e would tell Mr. Albert [Knight] about it so he could fix the problem. If we turned it in, United Vision would shut the truck down and Mr. Knight would not be able to make money from the truck and neither would I."

Tindell maintained that, if something was not put on the form, then UVL would not know anything about it, because if they would know about it, they "shut the truck down." As to whether a defective winch would disqualify a trailer from service, Tindell testified:

> Q: … if you filled out this document and said a certain winch or certain winches on Mr. Knight's trailer had thrown me down and this was before Mr. Gray's incident, as far as you know, United Vision would have gotten that information and either forced the repair of those things or disqualified the trailer from service, yes?
> A: No.
> Q: What would they have done?
> A: They wouldn't have done anything because the – if I had wrote – if I had wrote winch on there, they shut the truck and trailer down anyway, but the only thing that would have been written in was that a

12

winch slipped or a winch malfunctioned, that would be it. That's not really to them a safety issue.

Q: So if you wrote down winch malfunction, I think you said, they pull the trailer out of service?

A: They probably would. They might. I don't know.

However, Gray testified that Tindell never told him about the issue with the winches on the subject trailer. He stated that, although he had not had problems with the subject winch, he told Knight about other winches on that trailer that had given him trouble with the pawls not engaging and looking worn down. Per Gray, Knight advised he would fix it. Gray agreed he had to turn in daily logs and note maintenance issues on such. However, like Tindell, Gray testified Knight told them not to mark any maintenance issues or anything wrong with the truck on the logs; instead, drivers were to let him know and he would take care of it, as the truck and trailer would be taken "out of service" and "shut ... down." In this regard, Gray agreed he knowingly signed off on incorrect forms required by DOT and turned them in to UVL.

At trial, Knight testified that it was not true that he requires drivers to confront him first verbally with what needs to be fixed before they turn in their paperwork to UVL, and he further disputed that he told Gray and Tindell not to write down maintenance and repair problems. However, Knight did not recall Tindell verbally telling him on multiple occasions, before Gray was hurt, that some of the winches on the subject trailer were malfunctioning.

Todd Daigle ("Daigle"), UVL's regional safety manager in April 2014, testified that he inspected the trailer at issue two weeks before the incident. In his visual inspection, he saw no issues with the winches, and Gray did not tell him about any problems with the winches. Daigle testified he never has received reports or had any problems with Knight keeping his equipment in a state of repair and safe operation. When asked what he would do if a driver told him about a problem that his boss told him not to report, Daigle explained he would go

13

immediately to that item and make sure it actually is out of compliance; once confirmed it is out of compliance, it would be noted, and the driver would be instructed to annotate his paperwork and turn it in, holding the owner accountable. Daigle testified that, if a defect is found, he explains the findings to "the driver or the owner, whoever ... presented the truck ... and they have to take care of it." Daigle testified that failing to put things on the logs is breaking the law, and there are repercussions.

As outlined above, in its July 29, 2021 judgment, the trial court found Gray was 70% at fault for failing to properly report maintenance issues with the trailer and for causing the accident and resulting injuries. After a thorough review of the record and considering the factors set forth in **Watson,** supra, we find the record provides a reasonable basis for the trial court's allocation of fault.

While we cannot say Gray's failure to report maintenance issues with the trailer caused his accident, as he testified he had not noted a previous issue with the subject winch and no evidence reflects how long the trailer would have been taken out of service to repair other defective winches (if at all), we find the position of Gray's body was a cause of the accident and his injuries. Gray had both hands on the winch bar at the time of the accident, and the evidence reflects his head was close enough for the winch bar to hit him. Gray attended UVL orientation twice, and UVL trains drivers to face the trailer with the winch bar off to the right, stabilize themselves on the trailer by grabbing the rub rail, and properly tension the bar with the other hand. UVL training further instructs that the driver's head should not be over the bar, and Glenn testified that it is not an acceptable procedure to use two hands on the winch bar, and they do not train this way.

Gray agreed that, as a driver, it was his responsibility to be aware of what he is doing, the position of his body, and everything else while binding down a load. Gray further agreed that no one can look out for his safety but him. Gray admitted

14

he was taught to place his left hand on the truck, use his right hand and shoulder to push down the bar, and keep his head away from the bar, and we find this demonstrates awareness of the dangers, especially as he testified he had trouble with other winches on the trailer. As to the significance of what was sought by Gray's conduct in using two hands on the bar, he testified he was using two hands in order to "push the bar down." However, Glenn testified it was not acceptable procedure or proper for a driver, when tensioning a load, to take his hand off the trailer for the last two clicks, even if he stabilizes himself in a sturdy stance and uses two hands to put the last bit of pressure on the bar. Glenn stated they teach drivers the forward-facing positioning because there have been "injuries" in the past. Thus, we find Gray's conduct herein created a greater risk, and there is no evidence to suggest extenuating circumstances required Gray to proceed in haste without proper thought.

As a court of review, our inquiry on appeal is whether the trial court's factual findings herein were reasonable and amply supported by the record, regardless of how we may have weighed the evidence if we were sitting as the trier of fact. **Welch v. London**, 2020-0362 (La. App. 1st Cir. 12/30/20), 2020 WL 7768715, *3 (unpublished). Moreover, we are also aware that the allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and any allocation by the fact finder within that range cannot be clearly wrong. **Schexnayder**, p. 13, 190 So.3d at 774. Accordingly, applying the manifest error standard of review, we find a reasonable factual basis in the record for the trial court's application of comparative fault to the facts of this case. We further find that an allocation of 70% fault to Gray for causing the accident and resulting injuries was not manifestly erroneous.

15

## CONCLUSION

For the reasons set forth herein, the July 29, 2021 judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiffs-appellants, Courtney D. Gray and Shana M. Gray.

**AFFIRMED.**